UNITED STATES of America, Appellee,

v.

Enver CALBAS, Defendant-Appellant.

No. 700, Docket 86–1309.

United States Court of Appeals,
Second Circuit.

Argued Jan. 22, 1987.

Decided June 2, 1987.

Deborah J. Stavile, Asst. U.S. Atty., New York City (Rudolph W. Giuliani, U.S. Atty. for S.D.N.Y., Bruce A. Green, Asst. U.S. Atty., of counsel), for appellee.

Robert L. Herbst, New York City, for defendant-appellant.

Before LUMBARD, KEARSE and PRATT, Circuit Judges.

LUMBARD, Circuit Judge:

Enver Calbas appeals from his conviction for conspiring to distribute, and possess

with the intent to distribute, heroin and cocaine in the New York metropolitan area, and elsewhere, from November 1978 until 1984, in violation of 21 U.S.C. § 846.

Indicted on September 7, 1984 with seven others, Calbas was granted a motion for severance due to illness and was separately tried before Judge Broderick in the Southern District in August, 1985 on three counts of the 30–count indictment. Following three days of deliberation, the jury convicted him of the distribution-conspiracy but acquitted him on the other two counts, one charging conspiracy to import heroin and the other charging Calbas with participation in a single act of distribution of heroin in mid–1980. Calbas was subsequently sentenced to ten years imprisonment.[1]

Calbas now seeks reversal of his conviction on four grounds: (1) there was insufficient evidence to prove the distribution conspiracy alleged in the indictment or to link Calbas to it; (2) copies of pages from a spiral notebook maintained by the government to be a narcotics ledger of one of the conspirators were admitted without sufficient foundation; (3) testimony of an alleged government informant, proffered by Calbas to demonstrate his non-participation in the conspiracy, was improperly excluded as irrelevant; and (4) in its deliberations, the jury considered information outside the record, offered by a juror, which was prejudicial to Calbas. These arguments were rejected by Judge Broderick. We find no error and, accordingly, affirm Calbas's conviction.

I.

The conspiracy count upon which Calbas was convicted charged him with participation in "a loose-knit group of Albanian and Yugoslavian drug dealers allied together for the purpose of importing and distributing" multi-kilogram quantities of heroin and cocaine. The bulk of these narcotics,

1. Five of Calbas's co-defendants, in the meantime, had either been convicted of, or had pled guilty to, a host of offenses, including the same distribution conspiracy of which Calbas was convicted. One of the indicted co-conspirators, Stella Millaj, was acquitted in all respects. Another, Luan Lika, fled the jurisdiction before trial. We affirmed the convictions of those defendants who appealed by unpublished order on September 15, 1985, *U.S. v. Lika*, 85–1086.

according to the indictment, originated in Yugoslavia and Turkey and was then smuggled into New York for ultimate retail distribution. Calbas was accused, among other things, of helping to supply other members of the conspiracy with narcotics for resale in New York.

To establish Calbas's participation in the "loose-knit" conspiracy, the government relied primarily on the testimony of five persons who acknowledged themselves to be his criminal associates: Theresa Schroder, Vehbi Gundez, a.k.a. "Ohran", Beverly Ellis, Ali Ahmeti and Kabil Bajrami. In addition, the government offered the drug records of a sixth co-conspirator, Nazif Vrlaku. The government's case focused on the following: (1) Calbas's involvement in two attempts to import heroin from Turkey in 1979; (2) his efforts in New York that same year to sell heroin for Celal Yuksel, one of his alleged confederates; (3) his involvement in a sale of heroin to another of his co-conspirators, Skender Fici, in Brooklyn in mid–1980; and (4) Calbas's subsequent involvement with Vrlaku, an associate of Fici's. We briefly summarize the highlights:

## THE FEBRUARY 1979 TRANSACTION AND ITS AFTERMATH

On January 27, 1979, Calbas, a Turkish national then employed as a New York City taxicab driver, travelled to Istanbul, Turkey with Skender Fici on airline tickets which Fici had purchased—one in his own name and one in the name of "E. Calbas"—from Theresa Schroder, a travel agent with whom Fici worked in Staten Island, New York. At the time of purchase, Fici told Schroder that his friend "Enver" had heroin connections in Turkey and asked her to smuggle the heroin into the United States for him and to advance him $20,000 for its purchase. Schroder agreed and on February 6, 1979 met Fici and Calbas at the Istanbul airport and thereafter gave them the promised funds.

The following evening, Calbas, Fici, and Schroder met in Schroder's hotel room in Istanbul with a Turk who brought them a kilogram of heroin concealed in a baklava box. Calbas and Fici watched for the next two hours as the Turk sewed the heroin into the lining of Schroder's mink coat. The next day, Schroder and Fici travelled to Belgrade. From there, Schroder returned to New York with the heroin undetected. Fici remained in Yugoslavia to recruit a childhood friend, Kabil Bajrami, to assist him in reselling the heroin in New York.

Bajrami arrived in New York in mid-March. Together with Fici, he first approached Ali Ahmeti, who agreed to act as a retailer. The arrangements eventually fell through, however, and after another unsuccessful attempt, Bajrami and Fici approached Celal Yuksel, owner of a middle-eastern night club in Greenwich Village frequented by Calbas and various of the other co-conspirators. In May 1979, Yuksel bought one-half of a kilogram of Fici's heroin supply. Thereafter, in June 1979, Bajrami overheard Fici, Yuksel, and Arian Krliu quarreling in an upstairs room at Yuksel's club. Fici later told Bajrami that Krliu was angry with him for failing to pay one of Krliu's heroin sources when Fici and Krliu had been in Istanbul together several months earlier.

## THE MAY 1979 TRANSACTION

In May 1979, after his purchase from Fici, Yuksel recruited Ohran, a business associate, to travel to Istanbul to purchase another kilogram of heroin. Yuksel told Ohran to meet a man named "Mehmet" who would be in Istanbul with Calbas and who would supply the heroin.

On arriving in Istanbul, Ohran and his girlfriend checked into a hotel where Calbas was staying. His arrival was followed on May 25th by that of Beverly Ellis, one of Yuksel's bartenders. Calbas and Ohran met Ellis at the airport and, on the way to their hotel, Ellis gave them $16,000 from Yuksel for the heroin. Calbas thereafter introduced Ohran to the heroin supplier "Mehmet" and, after some negotiations, Ohran and Calbas handed Mehmet money in exchange for a kilogram of heroin. Soon after, Ohran was arrested with his girlfriend in Rome while travelling to New York with the heroin.

EVENTS IN THE SUMMER OF 1979

In late May, Krliu flew from Istanbul to New York carrying heroin in a false-bottomed suitcase. He was met at the airport by Ahmeti. In early June, Ahmeti delivered a pound of that heroin to Krliu and Yuksel for a pre-arranged sale at a diner in Queens. The buyers turned out to be undercover agents, however, and about a week later Ahmeti was arrested by DEA agents.

Meanwhile Yuksel had recruited Ellis, after her return from Turkey, to store heroin in her apartment and to help distribute it; throughout July and August, Ellis delivered heroin packages to Yuksel's customers.

In late August, Yuksel learned that one of his narcotics associates, Hassan Dungor, had been arrested. When told the news, Joey Lika, one of Yuksel's principal customers, advised Ellis to get rid of the heroin she had been storing for Yuksel and helped her to hide it in a locker at the East Side Airlines terminal in Manhattan. Yuksel and Ellis were arrested shortly thereafter.

By this time, Ahmeti was back in business with Krliu. With contributions from Lika and others, Krliu had helped Ahmeti make bail. Then, on September 15, 1979, the two met with Calbas at a Greenwich Village club. Later at his apartment, Krliu told Ahmeti of a proposal he had received from Calbas to purchase and help resell heroin in Calbas's possession and showed him a sample which Calbas had provided.

Calbas later told Krliu that he had control of eight kilograms of a ten kilogram supply of heroin which had belonged to Yuksel and that he, Calbas, had undertaken to sell the heroin since Yuksel's arrest. The heroin, according to Calbas, was stored in a ship or shipyard located in Houston, Texas. Reluctant to deal with Calbas directly, Ahmeti hesitated.

Several days later, Ahmeti overheard Krliu and Lika discuss with another the possibility of Ahmeti's murder. When Ahmeti confronted him, Lika explained that there had been concern that Ahmeti had agreed to become a government informant while he was in prison. He advised Ahmeti to flee the country, and Krliu offered Ahmeti approximately $100,000 to do so.

Ellis testified that Calbas later told her that there had been similar concern that Ellis had become a government informant during her imprisonment. However, Calbas told her that he had reassured certain unspecified people that Ellis would not cooperate with the government.

THE 1980 HEROIN SALE

In May or June of 1980, Fici introduced Bajrami to Calbas and told him that Calbas would be supplying Fici with heroin which they would purchase at Calbas's apartment in Brooklyn. On the day of the sale, Fici, carrying $15,000, ascended to Calbas's apartment first. Bajrami promptly followed and was admitted by Calbas. In the apartment, Bajrami saw Fici take a package, which he later learned contained a half-kilogram of heroin, as Calbas and a Turkish seaman stood by. Fici told Bajrami that Calbas would be able to continue to supply him with heroin in amounts of one to two kilograms per month and that the heroin would come by ship to the United States.

SUBSEQUENT EVENTS

When Bajrami was subsequently deported from the United States, Fici recruited Vrlaku to take his place. In January 1982, Vrlaku began dealing in heroin and cocaine with undercover DEA agent Roger Marchand. He told Marchand that he had friends in trouble in need of false passports and he asked him for help in obtaining them, indicating that he would be reluctant to continue to sell to Marchand without such assistance. After further dealings, Vrlaku revealed that Fici's heroin supplies were located in Texas.

Vrlaku's narcotics activity led to his arrest in September 1982. Free on bail, Vrlaku fled to Chicago shortly thereafter. On December 1, 1983, still a fugitive, Vrlaku checked into a Sheraton Hotel in Chicago under an assumed name. He was accompanied by a man and two women. After complaints about noise, Vrlaku and his comrades were told to leave the hotel. Af-

ter they left, two packets later identified as cocaine were discovered underneath a pile of clothes in the room and turned over to Chicago police. Posing as a hotel employee, a narcotics officer on the Chicago police force, Raphael Tovar, subsequently contacted Vrlaku and offered to sell him the abandoned cocaine. Tovar arrested Vrlaku when he arrived to make the purchase.

At the time of his arrest, Vrlaku was carrying a personal telephone book which contained the name "Enver Turku" next to Calbas's home telephone number. In his search of Vrlaku's hotel room, officer Tovar uncovered a spiral notebook which included the same name among a list of names. On another page in the notebook, Calbas's initials, "E.C." were written next to an entry which stated, in Albanian, "$74,000 [minus] 44,000 [equals] $30,000." Tovar testified that in his expert opinion the spiral notebook was in fact a drug ledger which recorded transactions spanning September through November 1983. A copy of a telephone bill also left in the hotel room revealed that at least two calls were made from the Chicago area to Calbas's home in Brooklyn in October 1983.

\*   \*   \*   \*   \*   \*

At trial, Calbas did not take the stand and called no witnesses. He did, however, introduce stipulations that Schroder did not identify him in a photospread and that no narcotics paraphernalia had been seized from his apartment in Brooklyn at the time of his arrest. In addition, he proffered testimony by government informant Gjon Berisha, which the court excluded.

## II.

Though we find only one claim worthy of discussion, namely, the jury's consideration of allegedly prejudicial extra-record information, we briefly treat Calbas's other contentions.

### 1. *Multiple or Single Conspiracy*

Under the first-prong of his sufficiency argument, Calbas contends that instead of demonstrating a single loose-knit conspiracy of Albanian and Yugoslavian drug dealers, the government proved no more than a series of isolated transactions evincing "casual or spasmodic relationships" which at best amounted to three unrelated conspiracies, separately headed by Fici, Yuksel and Krliu, and several unconnected transactions. We disagree.

Even accepting Calbas's characterization of the evidence, the jury could have reasonably concluded that the "organizations" which Calbas designates as headed by Fici, Yuksel and Krliu were all part of one large conspiracy. "Parallel sales operations can be part of the same conspiracy if there is evidence of mutual dependence and support." *United States v. Panebianco*, 543 F.2d 447, 453 (2d Cir.1976), *cert. denied*, 429 U.S. 1103, 97 S.Ct. 1128, 51 L.Ed.2d 553 (1977); *see also United States v. Tramunti*, 513 F.2d 1087, 1106 (2d Cir.), *cert. denied*, 423 U.S. 832, 96 S.Ct. 54, 46 L.Ed.2d 50 (1975). Such evidence existed here. The jury could conclude that the Fici-led importation scheme in 1979 was supplied, or helped in its supply, by Krliu and his people. At least part of this heroin landed in Yuksel's hands for redistribution, and the heroin which Krliu imported from Turkey during the same period was used by Yuksel and Krliu in their joint sale to undercover agents.

There was abundant other evidence indicating that the conspirators acted together as a group. For example, Lika, one of Yuksel's principal customers, helped Yuksel's agent, Ellis, hide Yuksel's heroin supplies when threatened by police detection and subsequently joined the other co-conspirators in helping Krliu raise bail money to release one of his confederates, Ahmeti. When Ahmeti proved to be a threat, Lika joined with Krliu in plans to kill Ahmeti and then to bribe him to flee the country when the plans were discovered. Calbas provided the loose-knit organization similar assistance, working as a point man in Turkey for two importation schemes in 1979; undertaking to distribute Yuksel's supplies soon after his arrest; and assuring various persons that Ellis would not turn government-informant. Finally, with respect to the post–1979 evidence of the conspiracy, the transactions which Calbas views as dis-

connected, the jury could have reasonably concluded were the trappings of an evolving conspiracy spearheaded by Fici.[2]

Finally, Calbas claims no error in the trial court's instructions to the jury, and we have found none. As we have often stated, the issue of single versus multiple conspiracies is one which is committed to the province of a properly instructed jury. *E.g., United States v. Carson*, 702 F.2d 351, 358 n. 11 (2d Cir.), *cert. denied*, 462 U.S. 1108, 103 S.Ct. 2456, 77 L.Ed.2d 1335 (1983); *United States v. Alessi*, 638 F.2d 466, 472 (2d Cir.1980); *United States v. McGrath*, 613 F.2d 361, 367 (2d Cir.1979), *cert. denied*, 446 U.S. 967, 100 S.Ct. 2946, 64 L.Ed.2d 827 (1980) Accordingly, the jury's determination must stand.

## 2. Calbas's Participation

■ There is no merit to the second-prong of Calbas's sufficiency argument, that the district court erred when it determined that there was sufficient non-hearsay evidence of Calbas's participation in the conspiracy to warrant the admission of co-conspirator statements against him under *United States v. Geaney*, 417 F.2d 1116 (2d Cir.1969), *cert. denied*, 397 U.S. 1028, 90 S.Ct. 1276, 25 L.Ed.2d 539 (1970). Cleansed of such statements, the record, according to Calbas, fails to demonstrate his membership in the conspiracy because, though it shows that he was present at and had knowledge of certain of the conspiratorial activities, it does not establish that he knowingly participated in them. We disagree.

The evidence showed that Calbas was present at two separate narcotics transactions in 1979 and another in mid–1980. Seen in its entirety, this evidence belies any contention by Calbas that he was unwittingly present on all three occasions.

As to the first, using a ticket purchased for him by Fici, Calbas travelled to Istanbul with Fici as part of a trip which was planned for the purchase of heroin. Once there, Calbas met Fici's courier, Schroder, who gave Fici and Calbas the purchase-money, and Calbas was present at the critical juncture of the transaction, the hotel room exchange of heroin for money; he watched for two hours as the heroin was concealed in Schroder's coat.

Later, in May 1979, Calbas introduced Yuksel's drug courier, Ohran, to Yuksel's heroin supplier, "Mehmet"; he attended meetings to discuss the logistics of the transaction; and he was again present at the critical juncture of a transaction, assisting in the exchange of heroin for money in the final meeting. Finally, in May or June 1980 Bajrami went with Fici to Calbas's apartment to get heroin from Calbas and witnessed the transaction.

## 3. The Spiral Notebook

Calbas next challenges the admission of pages from a spiral notebook which was seized together with a telephone bill from a hotel room which Vrlaku and three others had occupied shortly before Vrlaku's arrest. The government introduced the notebook pages and the other records[3] to es-

---

**2.** Accordingly, we do not share Calbas's concern that much of the evidence of the loose-knit narcotics network derives from activities occurring in 1979, the first year of the conspiracy, and that the activities of the conspiracy thereafter are demonstrated primarily through the activities of Fici and his agents, Bajrami and Vrlaku. The nature of the government's proof of conspiracy can differ with respect to different periods, *United States v. Armedo-Sarmiento*, 545 F.2d 785, 789 (2d Cir.1976), *cert. denied*, 430 U.S. 917, 97 S.Ct. 1330, 51 L.Ed.2d 595 (1977), and "a single conspiracy is not transposed into a multiple one simply by lapse of time, change in membership, or a shifting emphasis in its locale of operations." *United States v. Cambindo Valencia*, 609 F.2d 603, 625 (2d Cir.1979), *cert. denied*, 446 U.S. 940, 100 S.Ct. 2163, 64 L.Ed.2d

795 (1980). *See also United States v. McGrath*, 613 F.2d 361, 367 (2d Cir.1979), *cert. denied*, 446 U.S. 967, 100 S.Ct. 2946, 64 L.Ed.2d 827 (1980). That the "Yuksel" and "Krliu" branches dropped out of the government's case after 1979, therefore, need signify no more than that these members were arrested or were subject to other means of attrition not uncommon to criminal enterprises.

**3.** As indicated above, in addition to the telephone bill seized from Vrlaku's abandoned hotel room, the government introduced a personal telephone directory taken from Vrlaku at the time of his arrest, which listed Calbas's telephone number as well as the name "Enver Turku", and copies of Calbas's home telephone bill for October 1983, which confirmed that Calbas

tablish that Calbas continued his participation in the conspiracy after 1980 through narcotics dealings with Vrlaku, a confederate of Fici's.

■ Calbas first maintains that the notebook was erroneously admitted because there was insufficient evidence to establish Vrlaku's ownership of it. We disagree. As explained above, the notebook was found in a hotel room which Vrlaku had recently occupied and in which was found a kilogram of cocaine which Vrlaku later unwittingly attempted to repurchase from officer Tovar, after the latter posed as a hotel employee claiming to have found the narcotics. Moreover, the notebook contained the same reference to Calbas—"Enver Turku"—as Vrlaku's personal telephone directory, which was on his person when arrested. Consequently, there was enough evidence for the jury to find that the spiral notebook belonged to Vrlaku. *See* Fed.R.Evid. 901; *United States v. Sliker*, 751 F.2d 477, 488, 497–99 (2d Cir. 1984), *cert. denied*, 470 U.S. 1058, 105 S.Ct. 1772, 84 L.Ed.2d 832 (1985); *see, e.g., United States v. Bagaric*, 706 F.2d 42, 67 (2d Cir.), *cert. denied*, 464 U.S. 840, 104 S.Ct. 134, 78 L.Ed.2d 128 (1983).[4]

■ Calbas's second argument, that there was no proof apart from the narcotics ledger to connect Calbas to Vrlaku or the transactions recorded therein to the conspiracy itself, is also unavailing. Once the government established by a preponderance of the evidence that there was a conspiracy in which both Vrlaku and Calbas participated, *United States v. Geaney, supra*, it was entitled to introduce evidence of what any co-conspirator did in furtherance of the conspiracy, such as a record of narcotics transactions, without showing more.[5]

### 4. *Exclusion of Exculpatory Evidence*

Calbas also assigns reversible error to the district court's refusal to allow him to introduce testimony of a government informant, Gjon Berisha, to establish by negative inference that Calbas was not in fact a participant in the conspiracy.

Based on a pre-trial deposition of Berisha ordered by the court, Calbas proffered that Berisha would testify that, since 1980, Berisha had had narcotics-related conversations or dealings with over fifty members of the Albanian and Yugoslavian communities in New York—including Fici (whom he had known since 1979) and several of the other co-conspirators—but that in all that time Berisha had never seen Calbas participate in any drug-related activities nor heard his name mentioned in connection with them.

■ The district court wisely precluded Calbas from eliciting such testimony. Berisha's testimony would have opened the door to collateral inquiries concerning the nature and substance of Berisha's contacts with a host of unrelated or loosely related

had made several calls to Chicago and its environs during the period in question.

4. Calbas observes that Vrlaku was dealing in cocaine at the time but that there was no showing that the narcotics ledger reflected cocaine transactions; that there was no proof by way of handwriting exemplars or other testimony that Vrlaku was the author of the notebook; and that there was no proof that Vrlaku could speak and write Albanian, though the entries in the notebook were in that language. These are all considerations which speak to the weight which the jury should have placed on the evidence.

5. *United States v. Garcia-Duarte*, 718 F.2d 42 (2d Cir.1983), upon which Calbas relies, is not on point. There, we found that the district court erred in its admission of a "customer book" found in the apartment of a deceased narcotics dealer. Although the book contained a reference to defendant matching one entered in a personal telephone book found on the deceased, there was no evidence, apart from the customer book itself, linking defendant to the deceased's narcotics dealings. Here, by contrast, Calbas and Vrlaku are linked by their narcotics-related association with Fici and, through him, to the loose-knit distribution conspiracy.

We are also unconvinced by Calbas's contention that there was insufficient evidence that the narcotics ledger reflected transactions in furtherance of the conspiracy because Vrlaku was trafficking in cocaine while all the other evidence of the conspiracy concerned heroin. Vrlaku was clearly doing Fici's bidding, and he was dealing in both types of narcotics for him. Further, there is nothing which indicates which type of drug-activity is reflected in the narcotics ledger, nor anything to suggest that the conspiracy was limited to heroin.

participants in the general narcotics trade in the Yugoslavian and Albanian communities of New York as well as the extent of Berisha's observations concerning this trade as compared to those of other government informants. These inquiries would have rendered Berisha's testimony, already of doubtful relevance at best, hopelessly confusing. Judge Broderick's exclusion of the testimony was therefore appropriate under Rule 403 of the Federal Rules of Evidence.

### III.

Calbas's final complaint is that in its deliberations the jury considered information outside the record which was prejudicial to him.

The possibility that such information was considered by the jury was first discovered by Calbas's trial counsel, Robert Herbst, on August 20, 1985, the day the jury returned its verdict. In discussing the case with certain members of the jury, Herbst learned that during deliberations juror Bella Kleinman had told the jury that she had consulted a Brooklyn telephone directory not in evidence and had discovered that there were a number of Calbases listed in Brooklyn, including the section of Brooklyn where Calbas was identified by Bajrami as a participant in a heroin transaction in 1980. After further conversation with two of the jurors, Herbst sensed that in its deliberations the jury was interested in knowing where precisely Calbas had lived prior to 1981 and theorized that this was so because the jury thought it germane in determining whether to credit Bajrami's testimony. Herbst speculated that Kleinman's extra-record revelation of multiple listings for Calbas could have influenced

the jury in making such a determination. Consequently, he hired a private investigator to determine precisely what extra-record information Kleinman had imparted.

The investigator, David Barrett, subsequently contacted juror Linda Kalver, who executed an affidavit which stated that the sources of Kleinman's extra-record investigation were a 1979 and a 1981 or 1982 Brooklyn telephone directory and an old Manhattan telephone directory. The affidavit further stated that Kalver may have been influenced by Kleinman's investigation because it "seemed to confirm ... that there were 'Calbases' listed in approximate addresses tending to confirm the testimony presented by the government as to certain transactions or conversations ..."

On October 15, 1985, almost eight weeks after the jury's verdict, Calbas apprised the district court that extra-record information had been interjected into the jury's deliberations and moved for a new trial. After two conferences with counsel, Judge Broderick decided to conduct a series of transcribed interviews with the jurors outside the presence of counsel but with an opportunity for counsel to submit questions beforehand. Thereafter, Judge Broderick took unsworn testimony from ten of the twelve jurors and sworn testimony from Kalver.[6] He also questioned defense counsel and his private investigator under oath.

On November 26, 1985, the district court denied Calbas's motion. The court found that juror Kleinman resorted to extra-record information in an attempt to find information to disprove the government's theory of the case, apparently by showing that there was more than one Enver Calbas in Brooklyn at the time in question,[7] but

---

**6.** The twelfth juror was unable to testify due to illness.

**7.** In her interview with Judge Broderick, Kleinman indicated that she was prompted to make her extra-record inquiries because the testimony of one of the government's witnesses, most probably Kabil Bajrami, struck her as "curious." Bajrami testified that he accompanied Fici to Calbas's apartment sometime in mid–1980 to make a heroin purchase. He stated that he was unsure of Calbas's precise address but believed that it was located near the Fort Hamilton Park-

way and perhaps in the Fort Hamilton section of Brooklyn.

Kleinman apparently believed that Calbas lived in the same section of Brooklyn at this time as he lived subsequently, 1801 Ocean Parkway, and thought that the route Bajrami had described in getting to the apartment was circuitous, something which she confirmed by checking a map of the area. Kleinman testified that she then looked at a 1984 edition of a Brooklyn telephone book and learned that there were two Calbases in close proximity to one another. Ju-

that each time she attempted to discuss the results of her investigation with the other jurors, she was told her information could not be considered and she was barred from discussing it.

Though noting that Kalver stated that she may have been prejudiced against Calbas by the information introduced by Kleinman, the district court found that Kalver's testimony was not worthy of belief; the court noted, among other things, that it was substantially contradicted by the statements of almost all of the other jurors. Finally, the court found that Calbas was not prejudiced by the information since Kleinman had introduced the information for the sole purpose of persuading the jury to acquit Calbas; since the information bore most directly on the substantive count, upon which he was acquitted; and since the vast majority of jurors "quickly rejected the introduction" of it into their deliberations.

■ Calbas principally argues that the district court failed to determine with sufficient precision what information Kleinman actually imparted to the other jurors and was thereby unable to assess accurately the effect the extra-record information would have had on a hypothetical juror. We disagree.

That the court may not have expressly resolved whether Kleinman consulted a 1984 telephone directory, as she testified, or an older one, as Kalver states and other jurors suggest, has little bearing. Whatever Kleinman's sources, there is no doubt about what she attempted to convey—that in 1980 there was more than one "E. Cal-

bas" living in Brooklyn and that the jury could not be sure that Calbas resided at the apartment from which he allegedly dispensed heroin at that time.[8] It is difficult to see how such information—even had it been considered—could have influenced the jurors' deliberations *against* Calbas, even when measured by "its probable effect on a hypothetical average jury." *Miller v. United States*, 403 F.2d 77, 82 (2d Cir. 1968), (quoting, *United States v. Crosby*, 294 F.2d 928, 950 (2d Cir.1961), *cert. denied*, 368 U.S. 984, 82 S.Ct. 599, 7 L.Ed.2d 523 (1962)).

Calbas concedes, as he must, that Kleinman's revelations cut both ways: That there may have been Calbases listed in a Brooklyn directory at one time, may have helped confirm to a juror testimony by Bajrami that a heroin transaction occurred at Calbas's apartment in 1980, since there could have been listings for "Calbas" in the general vicinity. Yet it could have easily cast doubt on that testimony as well since there were many Calbases listed in Brooklyn and more than one in the vicinity of that transaction. Kleinman's telephone directory investigation was therefore incapable of helping to resolve the issue of Calbas's residence one way or the other. In any event, the issue of Calbas's residence bore most directly on the substantive count of which Calbas was acquitted.

More important, Calbas's residence in 1980 could have hardly have been material, given the evidence before the jury. There was no dispute about Bajrami's ability to identify him; Bajrami's testimony makes

---

ror Colon corroborated this testimony, indicating that Kleinman told the jury that "there was more than one person named [Calbas]" living on Ocean Parkway.

**8.** Calbas also points to the testimony of juror Russo in arguing that Kleinman may have transmitted more than telephone book information. In her interview with Judge Broderick, Russo stated that Kleinman told the jury that she had spoken with her son, a law student, and "had changed her whole attitude" on the case; that she had "checked the maps and ... [understood] that there is no such place in Brooklyn;" and that she "brought in newspapers and ... would read from them."

Whether or not Kleinman actually imparted the results of her street map investigation is unclear. Though certain jurors mentioned that they had learned that Kleinman had consulted maps, no other juror identified any information from a source separate from telephone books. Even if Kleinman had imparted specific information from the street maps, however, such information could only have helped the defense as it would have cast doubt on the possibility that Bajrami picked up narcotics at 1801 Ocean Parkway, Calbas's residence at least as of 1981.

No juror besides Russo mentioned disclosure of newspaper information, and no juror suggested that Kleinman relayed an account of any specific advice provided by her son.

clear that he had been introduced to Calbas before he witnessed the narcotics transactions in 1980 and that he had seen and had associated with Calbas on many occasions thereafter. Since it could not be doubted that Bajrami knew Calbas, it mattered little whether the heroin transaction about which he testified occurred in Calbas's apartment or elsewhere in Brooklyn: Neither Calbas's participation in that transaction, nor the credibility of Bajrami's testimony about it, hinged on where it took place.

Consequently, this case stands on a different footing than *Bulger v. McClay*, 575 F.2d 407 (2d Cir.), *cert. denied*, 439 U.S. 915, 99 S.Ct. 290, 58 L.Ed.2d 263 (1978), on which Calbas relies. In *Bulger*, the address bore directly on the credibility of defendant's alibi (*i.e.*, that when he was apprehended at a bus stop at 4:00 a.m. he was standing there for a bona fide purpose). Here, by contrast, the gravamen of Calbas's defense appears to be that he was innocently present at the scenes of various heroin transactions wherever they may have taken place. The record supports the district court's determination that Calbas suffered no prejudice from Kleinman's disclosures. *See, e.g., United States v. Weiss*, 752 F.2d 777, 783 (2d Cir.1985), *cert. denied*, —— U.S. ——, 106 S.Ct. 308, 88 L.Ed.2d 285 (1985); *United States v. Hillard*, 701 F.2d 1052, 1063–64 (2d Cir.), *cert. denied*, 461 U.S. 958, 103 S.Ct. 2431, 77 L.Ed.2d 1318 (1983).[9]

Finally, we find no substance in Calbas's suggestion that the district court acted improperly in conducting a limited inquiry and in failing to allow counsel to participate in the questioning of jurors. We have previously stated that "the trial court has wide discretion in deciding how to pursue an inquiry into the effects of extra-record information," *United States v. Hillard, supra*, 701 F.2d at 1064, and indeed has the power and the duty to supervise and closely control such inquiries. *United States v. Moten*, 582 F.2d 654, 665 (2d Cir.1978).

The limited inquiry conducted by the district court here was entirely appropriate under the circumstances. The court wisely refrained from allowing the inquiry to become an adversarial evidentiary hearing, so as to minimize intrusion on the jury's deliberations. It invoked an eminently sensible rationale in doing so, stating:

> There is no right of access to the deliberations through which a jury passed in reaching a determination, and open-ended inquiry into the questions considered by the jury and into the deliberations of that jury will, if not kept on under very close check, undermine the entire nature and integrity of our jury system. Any jury which has been out for a number of days or perhaps even a number of hours debating whether the government has established guilt beyond a reasonable doubt is going to be a jury within which strong differences have developed, and it is not for us, the judge or the lawyers, to inquire into chapter and verse of those differences, absent very compelling reasons.

*See also Miller v. United States, supra*, 403 F.2d at 82–84; *United States v. Moten, supra*, 582 F.2d at 665; Fed.R.Evid. 606(b).

Where the claim is made that a jury has considered extra-record information, the only fact-finding which is germane *after* a verdict has been rendered is a determination of the precise nature of the information proffered and the degree, if any, to which that information was actually dis-

---

9. Although we find the non-prejudicial nature of Kleinman's disclosures to be dispositive, we note that the record fully supports the district court's finding that the jury preempted discussion of Kleinman's information; that the "vast majority of jurors" refused to consider it in deliberations; and that Kleinman intended to use the information for acquittal. The district court was entitled to avail itself of these findings in concluding that Calbas had not been prejudiced. While we have stated that the trial court's post-verdict determination of extra-record prejudice must be an objective one, measured by reference to its probable effect on "a hypothetical average juror," it may appropriately consider the circumstances surrounding the introduction of that information in making such a determination. *See United States v. Marques*, 600 F.2d 742, 747 (9th Cir.), *cert. denied, Belcher v. United States*, 444 U.S. 858, 100 S.Ct. 119, 62 L.Ed.2d 77 (1979); *United States v. Castello*, 526 F.Supp. 847, 850 (W.D.Texas 1981).

cussed or considered. The line must be drawn, however, between inquiry as to the degree upon which the extra-record information was used in deliberations and the impression which jurors actually had about it; a juror is not permitted to testify about the latter, and, as we have indicated, the determination of prejudice is an objective one. *Miller v. United States, supra*, 403 F.2d at 83–84 n. 11; Fed.R.Evid. 606(b).

■ In light of the narrow scope of the inquiry warranted here, counsel's more active participation in a post-verdict *voir dire* was not necessary. *See United States v. Moten, supra*, 582 F.2d at 667; *United States v. Parker*, 549 F.2d 998 (5th Cir. 1977). The district court's limitation of counsel's participation could not have prejudiced Calbas in any way. It was enough that the district court permitted counsel to submit proposed questions in advance. *Cf. Bulger v. McClay, supra* (state court judge's questioning of only one juror by himself and without advice of counsel did not suffice).

Conviction affirmed.