**UNITED STATES of America**

v.

**William GREER, Stephen Hutchins, Thomas Cook, Gregory Stevens, and Glen Koski.**

**No. 2:95–CR–72.**

United States District Court,
D. Vermont.

Feb. 9, 1998.

Gary G. Shattuck, Rutland, VT, David V. Kirby, Asst. U.S. Atty., Office of the United States Attorney, District of Vermont, Burlington, VT, for U.S.

Robert Francis O'Neill, Gravel and Shea, Burlington, Robert Kalina, Rubin & Bailin, New York, NY, for William Greer.

Mark Alan Kaplan, Jarvis & Kaplan, Burlington, VT, for Stephen Brent Hutchins.

Thomas A. Zonay, Pratt Vreeland Kennelly & Zonay, Rutland, VT, for Michael Maple.

Bradley Specht Stetler, Stetler, Allen & Kampmann, Burlington, VT, for Thomas Cook.

Mark John Keller, Law Office of Mark J. Keller, Burlington, VT, for Gregory Stevens.

Richard C. Bothfeld, Bothfeld & Volk, P.C., Burlington, VT, for Gary Norman Peryea.

David J. Williams, Sleigh & Williams, St. Johnsbury, VT, for Martin Scott.

Martin A. Maley, Kissane Associates, St. Albans, VT, for Glen Koski.

## OPINION AND ORDER

SESSIONS, District Judge.

On June 30, 1997, Defendants filed a Motion for New Trial (Paper 448) pursuant to Fed. R. Cr. P. 29. They rely upon a newspaper article indicating that one juror was related to a person mentioned during testimony as having purchased ten pounds of hashish from Defendant William Greer in the early 1980's. They also assert that the juror disclosed this relationship to other jurors but not to the Court or counsel. In addition, a mutual friend of the juror and one of the Defendants contacted the juror and urged lenience; the juror told some of the other jurors about the call. The Defendants seek a new trial based on the juror's bias and the impropriety of the jury's consideration of extrinsic evidence. For the reasons cited below, the Court denies the Motion for New Trial.

### I. *Factual Background*

The grand jury returned a superseding indictment on July 24, 1996, charging each of the Defendants with participation in conspiracies to import and/or export hashish and marijuana and to violate the Maritime Drug Law Enforcement Act ("MDLEA"). According to the indictment, the conspiracy to import or export drugs occurred between 1980 and February 12, 1993, while the conspiracy to violate the MDLEA occurred between 1989 and 1991. In addition, Greer, Hutchins, and Cook were charged with conspiring to distribute and possess with intent to distribute hashish, marijuana, and cocaine from 1980 to 1993. Greer and Hutchins were charged with engaging in a continuing criminal enterprise ("CCE") from 1980 to 1991. Greer, Hutchins, and Cook were charged with importing hashish and currency violations in 1990. Finally, Greer and Hutchins faced charges of traveling in foreign commerce to promote illegal activity.

Trial commenced on March 11, 1997 and extended for approximately ten weeks. The jury returned a verdict on May 31, 1997. All of the Defendants were convicted of conspiracy to violate the MDLEA, and all but Koski were convicted of conspiring to import and

export drugs. The jury acquitted Greer, Hutchins, and Cook of the distribution conspiracy and acquitted Greer and Hutchins of the CCE charge. Greer was convicted of one currency violation count. The remaining charges resulted in not guilty verdicts.

Prior to jury selection, each panel member filled out a jury questionnaire which asked, *inter alia,* whether the potential juror, a relative, or a person close to that juror had ever been a victim of a crime, a witness to a crime, or accused of a crime. Juror John Baker responded "No" to that query and signed the responses under penalty of perjury.

Prior to announcing the case to the jury panel, the Court described the possible length of the trial and permitted those jurors with potential scheduling conflicts or other personal reasons based upon the trial's length to address those issues in chambers. The Court met with potential jurors without counsel present for the sole purpose of discussing requests for recusal unrelated to knowledge of the case. During such a conference, Juror Baker suggested that he thought he knew what case was to be tried and that he had an important matter to share with the Court. The Court informed Baker that the purpose of the conference was only to address personal excuses from service unrelated to knowledge of the case, and that issues relating to possible service on this case should be addressed in open court. Juror Baker did not disclose any knowledge of the case or an understanding of what case was to be tried.

During voir dire, the Court asked the jurors: "Have you had any experience involving yourself, any members of your family, or any close friend that relates to the use or possession of illegal drugs or narcotics within the past ten years?" (Vol. I at 149.) Juror Baker did not disclose knowledge of any relative being involved in drug activity within the past ten years. After a night's reflection, he did relate that his best friend died as a result of drug and alcohol abuse. Both government and defense counsel disclosed names of potential witnesses to the jury. The name Robert Baker was never mentioned.

The Court also questioned Juror Baker about his knowledge of the case. He stated that he had read about the case in the Burlington Free Press but had not formed an opinion concerning the Defendants' guilt or innocence. (Vol. 1 at 71.) He also told the Court that he could put aside any information he had received from outside sources concerning the case and decide it based exclusively on the evidence elicited in court. The Court asked all jurors if they could be fair and impartial, to which all of the jurors who were eventually accepted, including Juror Baker, responded affirmatively.

On each day of the trial the Court asked the jurors if they had spoken with any outsiders or among themselves about the case. The jurors always replied in the negative.

The name Robert Baker was mentioned twice during the trial, both times on April 8, 1997. (Vol. 13 at 133, 144.) The Government was attempting to establish, through the testimony of Michael Johnson, a pattern of drug distribution by William Greer dating back to 1980. Counsel for the Government asked Johnson to describe situations in which Greer distributed drugs to others. Johnson testified that Greer distributed ten pounds of red hashish to a Robert Baker in South Hero, Vermont in 1980 or 1981. Robert Baker was described as one of many persons who had purchased hashish from Greer in the 1980's. This testimony related to the conspiracy to distribute and CCE counts; the role attributed to Robert Baker was minimal. Defendants were acquitted of the conspiracy to distribute and CCE counts.

Juror Baker did not disclose his relationship to Robert Baker during the remainder of the trial. After the trial, Juror Baker told a news reporter that Robert Baker was in fact his brother. The article indicated that this juror did not disclose this relationship to counsel or the Court because, when asked at voir dire, he knew of no drug use by his brother within the last ten years. He apparently informed the reporter that other jurors also knew of his relationship with Robert Baker, but that this fact did not impede his ability to be impartial.

■ Defendants requested permission to question three jurors. In accordance with the Court's broad discretion to shape the scope of any inquiry into a juror's fitness or the jury's deliberations (see *United States v. Rosario*, 111 F.3d 293, 299 (2d Cir.1997) (juror bias), *cert. denied* —— U.S. ——, 118 S.Ct. 319, 139 L.Ed.2d 246, *and cert. denied* —— U.S. ——, 118 S.Ct. 418, 139 L.Ed.2d 320; *United States v. Hillard*, 701 F.2d 1052, 1064 (2d Cir.1983) (extrinsic evidence)), the Court held a full hearing to address Juror Baker's extrajudicial statements and the potential for bias. All of the jurors were interviewed by the Court; the parties were permitted to propose questions before and during the hearing.

At the posttrial hearing Juror Baker confirmed that Robert Baker was his brother. According to Juror Baker, the two were not close; he did not "regularly associate with" Robert Baker. (Jury Hr'g Tr. at 109.) Baker knew that his brother had been incarcerated in 1969 and believed that he had subsequently been jailed, but he recalled no specific details. Baker said that when he answered the question in the jury questionnaire about relatives or friends accused of a crime, he "didn't even give [Robert Baker] a thought." (Jury Hr'g Tr. at 98.)

Baker also told the Court that, before the jury was selected, a friend had called who was also acquainted with one of the Defendants. The person knew that Baker was on the panel and encouraged Baker to have a "sympathetic ear" to the Defendants' plight. (Jury Hr'g Tr. at 104.) Baker said he told the person off, announcing that he could not be bought. Baker said he attempted to describe this contact to the Court in chambers but could not do so, because the conferences were only for jurors who had scheduling conflicts with a potentially long trial.

Baker also described noticing that another juror raised the issue of outside contact in open court. The Court asked that juror whether the contact would prevent him from rendering a fair and impartial verdict, to which the juror answered in the negative. The juror was permitted to stay. In Baker's eyes, this exchange "solved [his] problem." (Jury Hr'g Tr. at 101.) Baker repeated the Court's question to himself in thinking about his outside contact. Baker said he decided that as the conversation did not affect his judgment and would not prevent him from being fair, he did not need to raise the issue.

Baker told the Court that, during voir dire, he truthfully answered the question regarding experiences with family members involving drug use in the past ten years. Juror Baker said he knew of no drug use by Robert Baker in the previous ten years.

When Robert Baker's name surfaced during Michael Johnson's testimony, Juror Baker figured that Johnson was referring to his brother. According to the juror, he did not speak out because the testimony had no impact on him. Juror Baker did not feel obligated to disclose the relationship because his contact with Robert Baker was minimal, Robert Baker was not himself a witness or a defendant, and thus the juror felt no threat to his impartiality. Again, Juror Baker figured that if he did inform the Court he would be asked whether the relationship prevented him from fairly rendering a verdict. Believing that this was not so, he simply continued to hear testimony.

Baker stated that he knew nothing about the Defendants before the trial or about Robert Baker's alleged relationship with Defendant Greer before Michael Johnson's testimony. According to Baker, he told two other jurors that the Robert Baker mentioned was his brother, but he did not tell any jurors that Robert Baker was a drug user or dealer.

The Court also interviewed all of the jurors who reached the verdicts to determine if they had been exposed to these statements and to assess their ability to be fair and impartial. Five jurors recalled hearing Juror Baker mention his relationship to Robert Baker, and five jurors remembered his description of contact from an outside source.

Some jurors recalled additional facts in Juror Baker's statements on these subjects, which were not related to the Court by any other jurors. Chief among these instances is the testimony of Juror Jacqueline Jones. Jones stated *inter alia* that before many if not all of the jurors, Juror Baker announced

that Robert Baker was his brother and that Robert Baker was involved in drug transactions with William Greer. "[W]e all kind of looked at him," said Juror Jones, and Juror Baker then told the group that he had informed the Court about this issue and that the Court had advised him that it "would cross that bridge when [it] got to it." (Jury Hr'g Tr. at 63–64.)

None of the other jurors reported hearing anything similar to these statements from Baker. No one else recalled Juror Baker describing his brother's drug transactions with Greer or claiming that he had spoken with the Court about his sibling relationship. Six of the jurors had not even heard Juror Baker say that he and Robert Baker were brothers.

Those jurors who heard that Juror Baker had spoken with a third party or that he was Robert Baker's brother described the statements as insignificant. They each felt it unnecessary to inform the Court of these statements. All twelve jurors affirmed that neither piece of information had an impact on their ability to render a fair and impartial verdict.

## II. *Discussion*

■ This Court led an inquiry into possible juror misconduct because it is the district court's responsibility to insure that Defendants receive a fair trial.

It is the role of a district court to safeguard a litigant's constitutional right to an impartial jury during all stages of trial, commencing with jury selection and ending when the jury returns its verdict. See *Smith v. Phillips*, [455 U.S. 209, 217, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982) ]. "Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen." *Id.*

*Olson v. Bradrick*, 645 F.Supp. 645, 653 (D.Conn.1986).

■ A strong presumption exists against setting aside jury verdicts based on charges of juror misconduct. *Tanner v. United*

*States*, 483 U.S. 107, 120, 107 S.Ct. 2739, 97 L.Ed.2d 90 (1987). Jury misconduct can infringe on certain rights of defendants. See *United States v. Perkins*, 748 F.2d 1519, 1533 (11th Cir.1984) (when extrinsic evidence reaches the jury, the rights of confrontation, of cross-examination, and of counsel may be jeopardized). However, if such allegations were frequently pursued, jurors would be less able to communicate freely in deliberations, less willing to render unpopular verdicts, and the public would lose its trust in the jury system. *Tanner*, 483 U.S. at 120–21. See *United States v. Radonjich*, 1 F.3d 117, 120 (2d Cir.1993) (public has interest in full and free discussion inside the jury room; jurors have interest in returning to private life after verdict without fear of being questioned or harassed).

■ According to the Supreme Court, litigants are "entitled to a fair trial but not a perfect one, for there are no perfect trials." *McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548, 553, 104 S.Ct. 845, 78 L.Ed.2d 663, *quoting Brown v. United States*, 411 U.S. 223, 231–32, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1973) (quotation omitted). Trials tax the resources of

the parties ... jurors performing their civic duty and ... society which pays the judges and support personnel who manage the trials. It seems doubtful that our judicial system would have the resources to provide litigants with perfect trials, were they possible, and still keep abreast of its constantly increasing caseload.

*McDonough*, 464 U.S. at 553. This is particularly so in the case of multi-week trials. See *id.* at 555. Courts should not lightly overturn jury verdicts based on charges of juror misconduct.

■ The investigation of juror bias or extrinsic evidence is governed by a variety of court-defined procedures and tests. It must not be forgotten, however, that the overarching purpose of either inquiry is to ascertain whether the case was fairly tried to an impartial jury. The Court has had an opportunity to observe these jurors both at the posttrial hearing and during the course of a complicated ten-week trial. Their performance was remarkable. The jurors' dedica-

tion, attention, and faithfulness to their duties leaves this Court with absolutely no question as to their impartiality.

### A. *Juror Bias*

The Court turns first to the question of whether Juror Baker was sufficiently biased to invalidate the trial. Defendants claim that this juror's bias is evidenced through four instances of nondisclosure. First, Juror Baker incorrectly answered a jury questionnaire query about convictions among family members. Second, he failed to disclose a conversation before jury selection with a third party who urged leniency. Third, Baker said nothing when asked at voir dire about drug use among family members in the past ten years. Fourth, this juror did not inform the Court, when Robert Baker's name arose in testimony, that Robert Baker was his brother.

■ A party moving for a new trial based on juror nondisclosure must first show that a juror failed to answer honestly a material question on voir dire. Then, the party must show that a correct answer to the question would have "provided a valid basis for a challenge for cause." *McDonough*, 464 U.S. at 556. This circuit does not require a new trial if it is shown that the nondisclosures hindered Defendants in their use of peremptory challenges. *See United States v. Langford*, 990 F.2d 65, 69 (2d Cir.1993) (limiting the holding of *United States v. Colombo*, 869 F.2d 149 (2d Cir.1989)). Evidence of bias would support a challenge for cause. Both prongs of the *McDonough* test must be met before a new trial may be obtained. *See id.; United States v. Shaoul*, 41 F.3d 811, 815–16 (2d Cir.1994).

In the exercise of its discretion the Court finds that Juror Baker was not biased. He did not intentionally lie to the Court, and the undisclosed information would not have provided a valid basis for a challenge for cause.

### 1. *Dishonest answer*

■ A wrong answer does not satisfy *McDonough*'s first prong if it was honestly given. *McDonough*, 464 U.S. at 555–56. *See Shaoul*, 41 F.3d at 815 (no misconduct where

juror did not think of the fact that her nephew-in-law was an AUSA during voir dire). The motive for the nondisclosure is essential, because "only those reasons that affect a juror's impartiality can truly be said to affect the fairness of a trial." *McDonough*, 464 U.S. at 556.

■ Defendants do not meet their burden with regard to this first prong. Juror Baker knew that brother had been incarcerated in 1969, but he was not sure when Robert Baker had later been convicted. Given the distance between he and his brother, and the many years which have elapsed since he knew his brother was incarcerated, Juror Baker made an honest oversight when the question of convictions arose.

■ Juror Baker did not dishonestly withhold information about the outside contact. He requested a conference with the Court so that he could discuss this conversation. The Court justifiably requested that Baker postpone bringing up any issues other than scheduling conflicts until jury selection had begun. Juror Baker's effort to bring this matter to the Court's attention indicates that he was not aiming to misrepresent himself. In that respect this case differs from *United States v. Colombo*, 869 F.2d 149 (2d Cir.1989), which discussed the juror who deliberately lies "precisely because [he or she wants] to sit on the case." *Langford*, 990 F.2d at 69. His observation of a juror in a similar situation provided Juror Baker with reason not to voice any concern. Baker too felt that his judgment was unaffected by the third party contact.

■ Juror Baker did not dishonestly answer the question at voir dire about drug use by relatives. Juror Baker had little contact with his brother and therefore no knowledge of Robert Baker's possible drug use in the past decade. Baker returned the following day and volunteered his recollection that his best friend died as a result of drugs. This juror also told the Court during voir dire that he had seen media reports about this case, but that those reports would not prevent him from being impartial. Baker's truthful answer and these other disclosures

rebut any claim that he intentionally lied to prevent his dismissal from the panel.

■ Once Robert Baker's name was mentioned in testimony, Juror Baker did not feel compelled to halt the proceedings and make an announcement. He noted that Robert Baker's connection to the case was minor and that he felt no qualms about his ability to remain impartial. Juror Baker assumed that if he did explain his relationship, he would simply be asked if that relationship prevented him from rendering a fair verdict. Satisfied that this was not the case, Juror Baker thought it appropriate to continue.

Baker offers credible testimony regarding the nondisclosures. The other jurors' accounts do not arouse suspicion over Baker's statements. It would be folly for this Court to expect twelve uniform and corroborating stories to emerge at the posttrial hearing. The trial spanned several months, and several more elapsed between the trial and the hearing. In the intervening period each juror's recollection of the trial faded and undoubtedly changed; media reports or the simple passage of time could have induced alterations in the jurors' memories. The answers given at the posttrial hearing are therefore not in perfect synch.

However, the other jurors in no way uniformly contradict Juror Baker. The Court does not find persuasive Juror Jones' statements regarding Juror Baker's disclosures to most if not all of the jurors, because there are no corroborative accounts. In fact, this account is directly contradicted by all of the other jurors, including Baker. Only five of the other eleven jurors even knew that Juror Baker and Robert Baker were brothers. Numerous factors could have caused Jones' memory to differ from those of the other jurors, including the passage of time and exposure to posttrial publicity. Without question Juror Jones was trying to remember the events of months before to the best of her ability. Regardless, her version of these events was contradicted by all of the others, and the Court finds her recollection of Baker's disclosures to be unreliable.

■ No supported allegations of bias by Juror Baker were made at the posttrial hearing. The Court will not attribute a malicious design to a juror where the evidence does not indicate one. Juror Baker explained his nondisclosures at the hearing; his thoughts were plain and understandable. A juror "who is trying as an honest man to live up to the sanctity of his oath is well qualified to say whether he has an unbiased mind in a certain matter." *Dennis v. United States*, 339 U.S. 162, 171, 70 S.Ct. 519, 94 L.Ed. 734 (1950). This Court observed Juror Baker both at this hearing and during an extended trial, throughout which he paid strict attention and took copious notes. His testimony is credible.

Juror Baker's course of action was not the recommended one for potential jurors. Baker did not reveal the third party conversation, his brother's conviction, and his relationship to Robert Baker. However, none of these nondisclosures were made with an illegitimate purpose. Baker simply did not perceive a significant concern because he did not doubt his ability to be fair and impartial. Juror Baker's motives in his conduct at voir dire and during the trial were benign.

### 2. *Challenge For Cause: Bias*

■ Even if Juror Baker's nondisclosures were dishonest, however, the second part of the *McDonough* test would not have been met. The correct answers to the questions on voir dire would not have provided Defendants with a valid basis to challenge Baker for cause. In fact, it is unlikely that any of the voir dire questions would have elicited the fact that Robert Baker was Juror Baker's brother. Robert Baker was not a witness, and neither side mentioned his name. If the information would not have emerged, it could not have formed the basis of a challenge for cause. *See United States v. Wilson*, 116 F.3d 1066, 1086 (5th Cir.1997) (*McDonough* inapplicable where juror did not lie and defendant "failed to request that the court pose the relevant questions" on voir dire), *cert. denied* —— U.S. ——, 118 S.Ct. 704, 139 L.Ed.2d 646 (1998).

■ Challenges for cause have traditionally been categorized as either based on actual bias or implied bias. However, last year the Second Circuit recognized a third type,

inferable bias, in *United States v. Torres*, 128 F.3d 38 (2d Cir.1997).

■■■ Actual bias is bias in fact. The bias could be admitted by the juror or found by the court after questioning the juror. *Id.* at 43. Trial courts enjoy substantial discretion to question jurors and to decide whether actual bias exists. *Id.* at 43–44.

■■■ Implied bias is concluded as a matter of law, regardless of the juror's actual partiality. The court evaluates whether an average person in the juror's position could be impartial. *Id.* at 45. Justice O'Connor's concurrence in *Smith v. Phillips*, 455 U.S. 209, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982), described implied bias as reserved for "extreme situations." *Smith*, 455 U.S. at 222 (O'Connor, J., concurring).

O'Connor favored applying the doctrine *inter alia* to jurors who are "close relative[s] of one of the participants in ... the criminal transaction." *Id.* The Second Circuit has not established categories of jurors in whom bias must be implied. A court must disqualify a juror who meets such criteria, *Torres*, 128 F.3d at 45, and this circuit has preferred to avoid "creat[ing] a set of unreasonably constricting presumptions [of bias] ... where ... there is no showing of actual bias or prejudice." *United States v. Brown*, 644 F.2d 101, 104–05 (2d Cir.1981), *quoting Mikus v. U.S.*, 433 F.2d 719, 724 (2d Cir.1970).

■■■ In part because of that holding, the Second Circuit in *Torres* approved a third doctrine, inferable bias. When a court perceives a risk of partiality based on a fact disclosed at voir dire, the court in its discretion may infer bias. *Torres*, 128 F.3d at 47. Bias need not be found as a matter of law. *Id.* The finding is "grounded in facts developed at voir dire," although a full inquiry is unneeded, and the juror need not be asked whether he or she could decide the case impartially. *Id.* In *Torres*, bias was inferred in a juror who had engaged in activities similar to those of the defendant on trial. *Id.* at 47.

It is unclear whether a posttrial allegation of partiality may only be proven by actual bias. The Supreme Court has not ruled definitively on this issue. *See Smith*, 455

U.S. at 215 ("the remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias"); *but see McDonough*, 464 U.S. at 557 (Blackmun, J., concurring) (concurring opinion supporting the idea that posttrial hearing could result in finding of implied bias).

Other circuits have required that parties moving for a new trial based on juror nondisclosure show actual bias. *See, e.g., United States v. Perkins*, 748 F.2d 1519 (11th Cir. 1984); *United States v. North*, 910 F.2d 843 (D.C.Cir.1990), *op. withdrawn and superseded in part on reh'g, on other grounds*, 920 F.2d 940 (D.C.Cir.1990). A neighboring district court has espoused the same rule. *See United States v. Sorrentino*, 190 B.R. 19, 25 (N.D.N.Y.1995) ("[I]t is not enough to show that a juror's answers were dishonest; defendant must also establish actual bias"), *citing United States v. Langford*, 990 F.2d 65, 68 (1993). This circuit recognized inferable bias during voir dire, *Torres*, 128 F.3d at 47, but it did not have occasion to decide whether implied or inferable bias pertain to posttrial inquiries.

The logic of invoking an implied or inferable bias analysis at this stage is questionable. It seems counterintuitive to conclusively presume bias or to use one risk-laden fact to infer bias, when more information is available to the Court. After a trial, a court can take the more certain path of investigating the jurors' actual conduct. This process focuses attention on whether bias posed a problem, instead of whether it could have.

Regardless, in the instant case this issue does not affect the outcome. The evidence does not justify a finding of any bias.

A finding of implied bias would be inappropriate. Juror Baker's situation is not so drastic as to demand a presumption of bias. He is related to a man who, according to one witness, engaged in drug deals with one of the Defendants. The alleged transactions are over fifteen years old and were not alleged to be in furtherance of the conspiracies for which the Defendants were convicted. To label Robert Baker a "participant[ ] in ... the criminal transaction" charged would vast-

ly overstate his relevance to this case. Juror Baker's connection to this case through his brother is feeble, as is the possibility of bias. The nondisclosed information does not compel the Court to conclude that a juror in Juror Baker's shoes must have been prejudiced.

Baker also received a third party's request to be sympathetic to the Defendants' cause before the jury was selected. An average juror who received such a message would not by necessity have been biased.

Inferable bias is no more appropriate than implied bias. As mentioned *supra*, there is no need to make inferences based on limited facts since the issues have now been fully investigated. In any event, neither the outside contact nor Baker's relationship to Robert Baker give this Court the perception that Baker would not have been able to decide the case impartially. The disclosed facts do not raise enough suspicion of partiality to justify such a finding. The Court in its discretion will not infer bias on the part of Juror Baker.

Finally, actual bias has not been found. Baker discussed the two pieces of undisclosed information at the posttrial hearing. He described a relationship with his brother which was obviously detached. His answers at voir dire and at the jury hearing reflect that attenuation, in that he overlooked Robert Baker's 1969 incarceration and he could not speak to his brother's possible later convictions or drug-related activities. This juror shared the fact that Robert Baker was his brother with two other jurors, but he did not draw any conclusions or attempt to influence others based on this fact. Juror Baker told the Court that this relationship in no way affected his ability to judge the case fairly.

The outcome of the trial also negates the argument that Juror Baker was biased simply because he was Robert Baker's brother. Robert Baker's role in the trial was inconsequential. Greer's defense to the distribution and CCE charges involved the statute of limitations, and the Defendants were acquitted on those charges. On Counts 1 and 4 the Defendants argued against a conviction based on a theory of multiple conspiracies. They did not challenge the conduct alleged, the evidence of which was overwhelming.

That William Greer was alleged to have distributed drugs to Robert Baker over fifteen years ago was not an issue of utmost significance to the Defendants. Moreover, the verdict does not bear the mark of a biased juror. Juror Baker's connection to Robert Baker did not produce a conviction on those counts for which his alleged activity was introduced.

Juror Baker's conversation with a third party did not instill any bias in him either. His posttrial testimony detailed the exchange between Juror Baker and an acquaintance who requested leniency. Baker said he flatly rejected the request and urged the third party not to talk to him. He learned nothing of substance about the case from this party, and he was not approached again. Baker believed his ability to judge impartially was not diminished by the outside contact. This Court agrees. Juror Baker's statements, as well as his participation in an intricate, carefully constructed verdict, both indicate that he was not prejudiced by the outside contact. *See United States v. Aiello*, 771 F.2d 621, 630–31 (2d Cir.1985) (affirming district court finding that juror who had been contacted three times during trial and was allowed to continue was not prejudiced; no defendants were named nor were any threats made during contact, juror believed she could be fair, and the jury took obvious care in reaching a verdict).

There is no other evidence which surfaced at or outside the hearing to support the proposition that Baker was biased. Defendants rely on the statements of Juror Jones, uncorroborated statements which this Court does not find persuasive. While some jurors heard about Baker's third party contact or his sibling relationship, they did not allege any prejudice on Baker's part. Juror Baker was credible at the jury hearing and was notably diligent throughout the trial. The circumstances surrounding these nondisclosures have been explored, and they leave no indication that Juror Baker was biased for or against Defendants. Since no bias is evident, there is no basis for a challenge for cause. The second prong of *McDonough* therefore has not been met.

B. *Extrinsic Evidence and the Jury*

Defendants next claim that extrinsic evidence prejudiced the jury against them. Juror Baker was spoken to by a third party before jury selection, and several other jurors heard of that conversation as well as the fact that Robert Baker is Juror Baker's brother.

■■■■ Any extra-record information of which a juror becomes aware is presumed prejudicial. *Remmer v. United States*, 347 U.S. 227, 229, 74 S.Ct. 450, 98 L.Ed. 654 (1954). A government showing that the information is harmless will overcome this presumption. *Id.* An objective test is used to evaluate the outside influence. Concerns arise when the extraneous information would likely affect a typical juror. *Bibbins v. Dalsheim*, 21 F.3d 13, 17 (2d Cir.1994).

■■■■ Jurors may discuss the precise nature of the extrinsic information which came before them and "the degree upon which the extra-record information was used in deliberations," but not "the impression which jurors actually had about it," in part because "the determination of prejudice is an objective one." *United States v. Calbas*, 821 F.2d 887, 897 (2d Cir.1987). Though this objective test considers the average juror, the circumstances of the actual jurors may contribute to the Court's evaluation. *Id.*, 821 F.2d at 896 n. 9 (2d Cir.1987) (district court "may appropriately consider the circumstances surrounding the introduction of [extra-record] information").

■■■■ The extraneous information here was harmless. Juror Baker's conversation with the third party involved no more than the party's suggestion that Baker could be picked for this particular case, and a recommendation of leniency toward Defendants. No specific details about the case emerged, and Baker was never called on again. This type of contact is not of a sort which would diminish the ability of an average juror to be fair. *See Aiello, supra.*

The two pieces of extrinsic information made available to some of the other jurors are so immaterial to the case that concerns of prejudice could not arise. The outside contact mentioned above took place before the trial had begun, and there was no indication that Defendants arranged the call. The conversation itself presented no information which could be improperly used in deliberations.

As for Juror Baker's brother, his role in the trial was minimal. He was mentioned twice in a ten-week trial. His name arose in the midst of testimony which was provided to prove two counts for which Defendants were ultimately acquitted. The fact that a fellow juror was related to Robert Baker offered no substantive evidence which could have influenced the deliberations. Knowledge of this fact or of the outside contact would not likely affect a typical juror in this case.

In fact, it is unclear how the hypothetical juror would be biased by these extraneous facts. There is no reason to believe that the extra-record information would have shifted jurors' sentiments against Defendants rather than for them. *See Calbas*, 821 F.2d at 895 (information juror gained outside of evidence could be interpreted to favor or hinder Defendant's case; because it did not resolve the issue for which it was consulted, it could not be said to have prejudiced the jury against Defendant).

The jurors' work further exemplifies their fairness. This case left them with volumes of evidence after weeks of testimony. The jury returned with a complex verdict resulting in convictions on some counts and acquittals on others, and which distinguished between defendants on certain counts. *See Aiello*, 771 F.2d at 631. This result was reached by an attentive and industrious jury, one which would not have been persuaded or confused by extraneous, insignificant evidence.

The jurors themselves unanimously discounted the outside information's influence on their task. Some jurors never heard about this evidence until after the verdict. The extraneous information made known to the others had no impact on their deliberations or their impartiality. *See Calbas* at 896 n. 9 (affirming district court finding that the jury "preempted discussion" of extrinsic information and that most jurors refused to consider it in deliberations); *United States v. Piccarreto*, 718 F.Supp. 1088, 1094 (W.D.N.Y.

1989) (no new trial required where extraneous remarks of one juror during trial were, by the other jurors' accounts, ignored and had no effect on deliberations).

In extrinsic evidence cases, "[t]he touchstone of decision ... is thus not the mere fact of infiltration of some molecules of extra-record matter ... but the nature of what has been infiltrated and the probability of prejudice." *Bibbins*, 21 F.3d at 16, *quoting United States ex rel. Owen v. McMann*, 435 F.2d 813, 818 (2d Cir.1970). All told, the extra-record information here is not material, and the possibility of prejudice is absent.

III. *Conclusion*

Based on the foregoing analysis, Defendants' Motion for New Trial (Paper 448) is hereby DENIED.