**UNITED STATES of America**

v.

**Mutulu SHAKUR, et al.,**

**UNITED STATES of America**

v.

**Marilyn BUCK, Defendant.**

Nos. SSS 82 Cr. 312 (CSH).
84 Cr. 220 (CSH).

United States District Court,
S.D. New York.

July 29, 1988.

---

Rudolph W. Giuliani, U.S. Atty., S.D.N.Y. (Kerri L. Martin, Elliot B. Jacobson, of counsel), New York City, for the U.S.

Chokwe Lumumba, Detroit, Mich., Jesse Berman, New York City, for defendant Shakur.

Judith L. Holmes, Jill Elijah, New York City, for defendant Buck.

## MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge:

This opinion resolves various post-trial issues.

*Post–Verdict Jury Inquiries*

After almost six months of trial, on May 11, 1988 and on the seventh day of deliberations, the jury convicted both defendants on all counts.

On June 7 the foreperson of the jury, Ms. Carter, telephoned Chambers and advised a law clerk that an investigator for the defendants had telephoned her at work, requesting an interview to discuss the jury's deliberations. Ms. Carter asked the Court for advice. I instructed her not to participate in such an interview pending further instructions from the Court. I then issued a Memorandum Opinion and Order dated June 7, 1988, 1988 WL 61957, familiarity with which is assumed. Counsel for the parties appeared at a hearing on June 8. Counsel for defendants said they had "some very specific things we would like to inquire of the jurors about," which they wished to explain in an *ex parte* application. June 8, 1988 hearing at Tr. 34. Over the government's objection, I agreed to hear defense counsel *ex parte*.

The *ex parte* hearing was convened immediately. Chokwe Lumumba, Esq., co-counsel for defendant Shakur, stated: "But there is one reason directed to one juror in specific and that's to the juror Ms. Carter, the one who was the foreperson. We have reason to believe, we feel good reason to believe, that Ms. Carter knows two of the witnesses who testified and actually knows of one, another one, well." *Id.* at 67. The continuing colloquy revealed that the witnesses in mind were Ahmed Obafemi, whose earlier name was Jesse Dixon, and Fulani Sunni–Ali, whose former name was Cynthia Boston. Both these individuals appeared as defense witnesses.

As to Obafemi, defense counsel stated that in a post-verdict critique, Obafemi told counsel that when he testified, he recognized Ms. Carter, one of the jurors, as someone he had known under the name of Janet McClellan when both lived in New Rochelle.

Defense counsel made other points during the *ex parte* hearing which I need not presently discuss.

In a Memorandum Opinion and Order dated June 9, 1988, 1988 WL 64845, familiarity with which is also assumed, I rejected certain defense requests. As to Ms. Carter's possible acquaintance with Mr. Obafemi, I made counsel aware that during a telephone conversation between Ms. Carter and the deputy court clerk, Ms. Szalay, a day or so after the verdict, Ms. Carter stated that she had recognized in Obafemi the "Jesse Dixon" she had known in high school in New Rochelle. Ms. Carter also mentioned to Ms. Szalay that another trial juror, Floyd Mitchell, had during the course of the trial related to other jurors a meeting he had had with a Mr. Douglas, a

prospective juror who was not selected as a trial juror. The Court also made that fact known to counsel in its June 9, 1988 opinion.[1]

The transcript of the June 8, *ex parte* hearing was released to government counsel. Briefs were directed with respect to what, if any, further steps should be taken.

The government, based upon its review of the June 8 *ex parte* application, argued in a letter brief dated June 17 that under Second Circuit authority no further inquiry was justified or required in respect of any of the three subjects: Carter's acquaintance with Obafemi; the Mitchell–Douglas encounter; and defendants' contention that Carter might have known Fulani Sunni–Ali (or Cynthia Boston). In the alternative, the government argued that if any inquiry were to be held, it should begin with the testimony of Obafemi on what the government characterized as the issue of waiver. The government was strongly skeptical of defense counsel's claim during the June 8 *ex parte* hearing that Obafemi, recognizing Carter in the jury box as a former acquaintance when he testified in April, said nothing to defense counsel about that recognition until after the verdict had been returned.

In a Memorandum Opinion and Order dated June 29, 1988, 1988 WL 70299, familiarity with which is also assumed, the Court concluded that some factual inquiry should be held. I held there was no basis for inquiry concerning Sunni–Ali. As to Obafemi, I directed that he testify *in camera* on the question of waiver. I amended that direction to permit counsel and the defendants to be present when Obafemi testified in the courtroom. Counsel were also permitted to suggest questions to the Court prior to and during the examination, which the Court conducted. That testimony was taken on July 13, 1988.

The June 29, 1988 Order deferred any inquiry of Ms. Carter until Obafemi had testified. I declared my intention in that Opinion to interrogate juror Mitchell *in camera* with counsel being permitted to file suggested questions. At the same time I directed counsel to file suggested questions of Ms. Carter, should I decide to interview her *in camera*. In conducting *in camera* interrogations of jurors, after considering counsel's suggested questions, I followed the procedure approved in *United States v. Calbas*, 821 F.2d 887, 896 (2d Cir.1987).[2]

Subsequent to Obafemi's testimony, but without having resolved the issue of waiver, I thought it best to interrogate Ms. Carter, and did so *in camera*.

Upon the record thus made, counsel have submitted further briefs and oral argument. Defendants contend that, on this record, they should be granted a new trial. In the alternative, defendants call for further interrogation of the two jurors questioned thus far, all the other jurors, the prosecutors, and members of the Court's staff. The government contends that the motions for new trial should be denied, and that no further inquiry is justified or required.

I turn to a detailed consideration of these incidents.

## A. Janet Carter's Knowledge of Ahmed Obafemi, a Defense Witness.

### 1. Factual Background

The defense witnesses called at trial included two former residents of New Ro-

---

1. Defendants are critical of the Court for not immediately advising counsel of the conversation between Ms. Carter and Ms. Szalay. As for the Carter–Obafemi acquaintance, this was not information known only to the Court. *Cf. Rushen v. Spain*, 464 U.S. 114, 104 S.Ct. 453, 78 L.Ed.2d 267 (1983). If Carter knew Obafemi, Obafemi knew Carter, as in fact he advised defense counsel shortly after the verdict (on defendants' account of the chronology). As for the Mitchell–Douglas encounter, its nature appeared peripheral; but counsel were advised of the incident in the Court's June 9 Memoran-

dum, evidence has been taken, and the issue is discussed *infra*.

2. Notwithstanding the sanction of *Calbas*, defendants complain of the procedure. They contrast it with the interrogation of another juror, Andrea Herbert, while the trial was in progress. Post-verdict inquiries of jurors stand upon a different procedural footing than when the jurors are still sitting in the trial, as do interrogations of a witness such as Obafemi. *Calbas, supra*, 821 F.2d at 896 and cases cited. The Herbert incident is discussed further *infra*.

chelle: Ahmed Obafemi and Fulani Sunni–Ali. At the time they lived in New Rochelle, Ahmed Obafemi's name was Jesse Dixon. Fulani Sunni–Ali's name was Cynthia Boston.

At the beginning of the *voir dire,* prospective jurors were given a questionnaire. The questionnaire included the names of individuals suggested by the prosecution and defense. Each prospective juror was asked to "look carefully" at the list of names, and indicate (by checking "yes" or "no") whether "any of these names [are] familiar to you in any way." Questionnaire at 9–11. Defendants included the names Fulani Sunni–Ali and Cynthia Boston in the questionnaire. They did not include the names Ahmed Obafemi and Jesse Dixon. Ms. Carter answered "no" to all the names listed.

After filling out the questionnaires, prospective jurors were chosen by lot and questioned individually by the Court in the presence of the defendants, their counsel, and the prosecutors. From the questionnaire and the subsequent questioning of Ms. Carter, it developed that she was born in New Rochelle; is a resident of Westchester; and is married.

The reference to New Rochelle prompted Mr. Lumumba, counsel for Shakur, to telephone Obafemi and members of Obafemi's family "to find out if in fact they knew a Janet Carter." Transcript of June 8, 1988 *ex parte* hearing at 68. As noted, Obafemi had lived in New Rochelle under the name "Jesse Dixon." Members of his family still lived there. The defense wanted to learn more about this prospective juror. When a comparable defense effort came to the Court's attention (*See Point B, infra*), the Court instructed counsel to make no further inquiries about prospective jurors, leaving jury selection to the formal *voir dire* process.

During his inquiries concerning Janet Carter, Mr. Lumumba reached Obafemi in California, where Obafemi was travelling. Lumumba also spoke to members of Obafemi's family. The name "Janet Carter" was not familiar to any of them.

When Obafemi returned from California, the trial was in progress and Carter had been seated as a juror. Obafemi came to the courthouse and asked Lumumba what it was he had wanted of him. Lumumba told Obafemi that "I had wanted to inquire of you if you knew this particular person who was on the jury, because she comes from New Rochelle and I know that you have a long history in New Rochelle." June 8, 1988 transcript at 72. But Lumumba testified that he indicated to Obafemi that under the Court's ruling, "there is no further inquiry we can have of anybody or and no further discussion that we can have with anybody on any of these jurors." *Ibid.*

Obafemi was a "regular attendant" of the trial, which lasted just under six months. He was there for the opening speeches of counsel; he was there the day before the verdict; all told, he attended the trial at least "a third of the time." July 13, 1988 testimony of Obafemi at Tr. 5–6.

Obafemi testified that, passing Carter in the hall one day, her face seemed familiar. However, he positively recognized Carter as someone he had known before when, on April 13, Obafemi took the stand as a defense witness. Obafemi then recognized Carter as someone he had known in New Rochelle under the name Janet McClellan.

Obafemi completed his testimony and left the witness stand on April 13. He testified that he did not tell Lumumba, either defendant, or any other defense counsel that while testifying he had recognized a juror as one who had known him when he lived in New Rochelle. Obafemi explained his silence on the point by "a combination of things"; first, Lumumba had been "emphatic about not wanting to hear anything about the jurors," and "secondly, personally to me it didn't make a difference." *Id.* at 18.

Lumumba has said in the June 8 *ex parte* hearing that Obafemi first told him that Obafemi had recognized a juror during a post-verdict critique, held a week or two after the verdict. Tr. 86. Obafemi gave the same account in his testimony. Tr. 18.

Obafemi testified that after the post-verdict critique, Lumumba asked Obafemi why he had not told defense counsel earlier that he had recognized a juror. Obafemi testified:

"It was at that point that he asked me, well, why didn't I tell him. I raised with him that he had told me not to even talk to him about jurors.

But I probably didn't raise it because I didn't think that it made a difference."

Tr. 20.

Asked to expand on that last answer, Obafemi testified:

"A. Well, I hadn't seen this person in years, and I don't even know that she had recognized me. I assumed that at the point that, at some point in the testimony the name, she would have recognized the name, my original name. So when I say I didn't think it made a difference, it was somebody that I had known years ago. It just didn't compute."

*Ibid.*

As described by Obafemi, the particulars of his acquaintance with Carter (then known to him as Janet McClellan) are that Obafemi first met her in the earlier 1950's, when Obafemi was in the seventh grade at school and McClellan was in the fifth grade. For a time, Obafemi had a relationship with a girlfriend of McClellan (as I will call her during this narrative), and McClellan had a relationship with a male friend of Obafemi's (then known as Jesse Dixon). In the late 1950's Obafemi's relationship with McClellan's friend came to an end, and from that time he saw less of McClellan. Tr. 26. The last time Obafemi recalled seeing McClellan before testifying was 1959, "could be '60." Tr. 23.

During the 1950's Obafemi was arrested several times. Obafemi was also smoking marijuana; and towards the end of his acquaintance with Janet McClellan he "had just started using heroin." Obafemi does not believe that he was arrested on any narcotics charges during his acquaintance with McClellan, and he doubts that he had any conversations with McClellan about drugs. Tr. 29.

Asked about the defense's timing in deciding to call Obafemi as a witness, Mr. Lumumba said: "I always felt that that was an option." June 8, 1988 hearing at Tr. 88. Lumumba and Jesse Berman, Esq., co-counsel for defendant Shakur, agreed that calling Obafemi "depended on what Margo Mitchell was going to testify to." *Ibid.* Mitchell, called as a government witness, was listed on the *voir dire* questionnaire.

Counsel say that the definitive decision to call Obafemi was made after Mitchell testified, and about two weeks before Obafemi actually appeared as a witness. Obafemi's testimony is to the same effect. Tr. 31. Prior to that decision, the discussion took this course, in Obafemi's words:

"A. Well, for a while it had always been up in the air. I mean, we talked about it, we talked about me testifying, and I know it came up, but it came up like, I think I might need you to testify in this case."

Tr. 30.

Obafemi was concerned about testifying because of his prior involvement with the law. He testified at the post-verdict hearing:

"A. Well, if I recollect correctly, it was during the course of the trial, and it had been, and I say we talked about it, but I wasn't sure because when it was first raised I questioned whether I should testify or not, and exactly for the reasons that happened in the trial.

Q. What do you mean by that?

A. Because of my past history, but I was assured at some point that that wouldn't come out, because the charges had been so long ago. But I guess it was conclusive that I was going to testify probably about two weeks before I actually testified."

Tr. 31.

Lumumba was aware of Obafemi's prior criminal record. Tr. 32.

Shakur's counsel, asserting that their first awareness of Obafemi's prior acquaintance with Janet Carter, came post-verdict, suggested possible prejudice to the defendants resulting from a juror's prior knowl-

edge of something unfavorable about a defense witness. Thus Mr. Berman argued that "it goes to the question about whether she was a biased juror having known something from the outside about these people" [including Fulani Sunni–Ali in his remarks]. Tr. 80. Mr. Berman carried the argument further with respect to Obafemi:

"If she came into the case with the bias of knowing that the Ahmed Obafemi or the Jesse Dixon she knew was someone who's word you couldn't take when she knew because he was a heroin addict at the time, whether or not she communicated that to the other 12, she had no business being on that jury and she had no business not telling us about it when the name was on the questionnaire."

Tr. 82–83.

In advancing that latter argument, Mr. Berman incorrectly assumed that the names Ahmed Obafemi and Jesse Dixon appeared on the jury questionnaire. In point of fact, defense counsel had not included those names.

Defense counsel expressed a particular concern because of the small, tightly knit nature of the black community in New Rochelle. Thus Mr. Lumumba stated at the June 8 hearing:

"Remember we are not only talking about New Rochelle but we are talking about essentially black New Rochelle, basically, which is a smaller group of people. They all tended to go to the same schools and shared the same social interreaction."

Tr. 80.

Obafemi underscored that observation. He testified that Janet McClellan lived in "the projects" in New Rochelle, whereas his family lived elsewhere in the town. However, he continued:

"But the projects was such that that's where everybody hung out. The baseball field was over here. So you played baseball here, football here. Basically our life resolved around the projects. Everything we did was in the projects. The social room was downstairs in the building she lived in, and the only time we would probably go out of the confines of the projects would be to go over to the boys club.

Most of our time was in the projects, sitting around the lobby in the evening in the summer, playing baseball, football."

Tr. 47–48.

As noted, the government argued vigorously that defendant had waived any objection arising out of Carter's presence on the jury. I consider the issue of waiver *infra.* But it seemed right to interview Carter, after first tendering to counsel the opportunity to suggest questions. That interview took place *in camera* on July 19.

Ms. Carter had no prior knowledge of the direction of the Court's questions. Tr. 2.

The Court then put these questions:

"Q. Then I'll ask you.

And the first area I want to ask about is this:

Did a time come during the trial when you recognized any witness that was called, either by the prosecution or the defense, someone you had previously known?

A. Yes.

Q. What witness did you recognize as someone you had previously known?

A. Ahmed Obafemi.

Q. He was called as a witness by the defense, was he not?

A. Yes.

Q. Had you previously known him under a different name?

A. Yes.

Q. What name was that?

A. Jesse Dixon."

Carter went on to say that she had known Jesse Dixon in high school. Before the trial she had not seen him for "probably over twenty years." Tr. 5. In high school, she would see Dixon "probably every day," but: "We were never alone in situations together. He was friends with friends that I was friends with." Carter could not recall if Dixon graduated from high school or failed to do so. (Obafemi said he had been expelled). Carter remembered problems Dixon may have had with law enforcement

authorities "when we were very young." She added:

"Q. What do you remember about that?

A. He used to get in trouble. But I can't remember what he used to do. And sometimes his name would be in the paper. Nothing serious, I don't think. It was like just mischievous type of a kid.

Q. I see. And do you recall that sort of incident being described in the paper at the time when you knew each other in school, as you've described to me?

A. Yeah. It was when we were young.

Q. Do you remember any details at all of any of those incidents?

A. No. No.

Q. All right. Prior to trial, were you aware of any use of elicit [sic] drugs by Jesse Dixon?

A. No."

Tr. 6.

On the question of her discussing her recognition of Obafemi with other jurors, Ms. Carter said this:

"Q. After you recognized Mr. Obafemi or Mr. Dixon when he testified, at any time did you tell any of the other jurors that you had recognized one of the defense witnesses?

A. A couple of the jurors asked me.

Q. When did that occur?

(Pause)

A. Oh, the day he was on the witness stand.

Q. And when he was on the witness stand, did a conversation occur between you and other jurors as to whether you knew him?

A. No, one person or two people said, 'As small as New Rochelle is, you must know him.' And I said, 'Yes, I do.' And that's it.

Q. All right. Have you described everything that was said between you and other jurors on that subject?

A. Yes.

Q. Did any other juror ask you anything about what you may have known about this individual?

A. No.

Q. Did you tell any other juror anything about what you knew or remembered about this individual?

A. No."

Tr. 8–9.

Ms. Carter mentioned her recognition of Obafemi to the deputy court clerk following the verdict. *See* Memorandum Opinion and Order dated June 9, 1988 at 4. Ms. Carter stated on that point:

"Q. All right. Then did a time come, Ms. Carter, when you told my Deputy Court Clerk, Mrs. Szalay, that you had recognized this individual as someone which you knew?

A. (Nodding).

Q. Is that so?

A. I don't recall telling her that, but I could have. The next day I was still hysterical from the day before.

Q. At least do you recall a telephone conversation taking place?

A. Yes, she called to see how I was feeling.

Q. All right. Who initiated that call? Was it you, or was it she?

A. Mrs. Szalay.

Q. All right. And today, do you have any specific recollection of what you said to her in that conversation about your prior acquaintance with this individual?

A. No. I don't even remember mentioning his name."

Tr. 9–10.

### 2. Discussion

Defendants now contend that this incident entitles them to a new trial, or in the alternative, to further jury inquiry. The government presses its argument of waiver. I will first discuss waiver, and then the merits of defendants' claims.

*Waiver*

■ A defendant may waive his right to complain of prejudicial outside influence upon the jury if, knowing of that influence, he or his counsel " 'nevertheless stood mute, gambling on an acquittal while holding this issue in reserve' ", *United States v. Moten*, 582 F.2d 654, 667 (2d Cir.1978), quoting *United States v. Gersh*, 328 F.2d

460, 463 (2d Cir.) *cert. denied,* 377 U.S. 992, 84 S.Ct. 1919, 12 L.Ed.2d 1045 (1964). This may be regarded as waiver by deliberate concealment.

But waiver in this context is not limited so narrowly. Defense counsel are also under a duty to see that potentially prejudicial influences are fully explored during the voir dire examination of prospective jurors. That principle is illustrated by *United States v. McKinney,* 429 F.2d 1019, 1027 (5th Cir.1970), where the post-conviction argument was one of possibly prejudicial newspaper articles published before the trial. The Fifth Circuit wrote:

> "In deciding this issue, we note at the outset that when possibly prejudicial newspaper articles have been published before the trial, as they were in this case, the defendant's counsel clearly has a duty to see that the issue of the publicity is explored during the voir dire examination. The ultimate question is whether it is possible to select a fair and impartial jury, and the proper occasion for such determination is upon the *voir dire* examination.' *Blumenfield v. United States,* 8 Cir.1960, 284 F.2d 46, 51, cert. denied. 365 U.S. 812, 81 S.Ct. 693, 5 L.Ed.2d 692. It would be an aberration in the administration of criminal justice if counsel for a defendant could simply remain silent about the problem of pre-trial publicity during the voir dire examination and then assert the existence of the publicity for the first time after an adverse verdict."

No waiver was found in *McKinney* because the record indicated that defense counsel had in fact attempted to explore the issue of prejudicial publicity in the course of voir dire examination, but was cut off by the trial judge. However, the concept of the waiver by failure to exercise due diligence is clear enough.

The Second Circuit considered waiver resulting from counsel's failure to conduct a more thorough voir dire in *United States ex rel. Owen v. McMann,* 435 F.2d 813, 820–21 (2d Cir.1970). Post-verdict revelations disclosed that, during the trial or deliberations, three jurors told the others that they "knew all about" defendant Owen; referred to unfavorable incidents in his life entirely unrelated to the charge; and "informed the jury that they knew various things about Craig Owen and that they had reason to believe from outside information that he was guilty." 435 F.2d at 815. One of these jurors, a Mrs. Janak, was questioned on the voir dire by Owen's attorney, Tierney. Judge Friendly wrote:

> "Mrs. Janak testified that Tierney had asked whether she knew Owen and she had replied in the negative, which was true, although perhaps not quite the whole truth since she did know something about him. While counsel may have been at fault in not asking more directly whether the jurors knew anything concerning Owen that would affect their judgment, the State has not sustained its burden of showing that the defense consented that the jurors who were to try Owen could bring into the jury room specific factual material about him that was derived solely from their personal lives rather than the evidence at trial."

*Id.* at 821.

*Owen* recognizes counsel's duty to conduct a thorough voir dire. In the absence of duty, the issue of "fault" does not arise. Each case turns on its own facts.

▮ In the case at bar, waiver by deliberate concealment could be found only if the Court is in a position to conclude that Obafemi told the defense team prior to the verdict that he had recognized a juror. Obafemi has testified that he did not do so. Mr. Lumumba has stated that Obafemi did not do so. The government, refraining to press for a more complete record, undoubtedly recognized that other defense counsel would deny any pre-verdict knowledge of Obafemi's prior acquaintance with Carter.

Nonetheless, the government argues in its July 15, 1988 letter brief that the account is inherently implausible, and should be rejected. There is surface force to the argument. Obafemi was closely allied with Shakur, politically and as a friend. He was in constant attendance at the trial. He had numerous conferences with defense coun-

sel with respect to his possible testimony. During the trial Obafemi would on occasion perform tasks for the defense team, such as xeroxing. Tr. 7. Given these circumstances, it seems startling to suggest that at no time prior to the verdict did Obafemi tell the defense team that he had recognized a juror as a former acquaintance. Obafemi's omission is particularly startling in view of the fact that Carter knew him when he was having difficulties with the law, the very concerns which Obafemi had expressed when his appearance as a witness was first discussed with the defense team. Finally, Obafemi has an obvious motive to affirm falsely on the point, in an effort to upset the jury verdict adverse to Shakur.

Nevertheless, the government bears the burden of proof on this contested issue of fact, and there is no affirmative evidence to support its contention. It is generally said that a party bearing the burden of proof cannot carry it simply by inviting the finder of fact to disbelieve the adverse party's witnesses. In *Martin v. Citibank, N.A.,* 762 F.2d 212, 217–18 (2d Cir.1985), the Second Circuit expressed that general proposition:

> "Admittedly, as Judge Learned Hand has observed, 'the denial of one, who has a motive to deny, may be uttered with such hesitation, discomfort, arrogance or defiance, as to give assurance that he is fabricating, and that, if he is, there is no alternative but to assume the truth of what he denies.' *Dyer v. MacDougall,* 201 F.2d 265, 269 (2d Cir.1952). However, the *Dyer* opinion went on to hold that while 'in strict theory a party having the affirmative might succeed in convincing a jury of the truth of his allegations in spite of the fact that all the witnesses denied them, we think it plain that a verdict would nevertheless have to be directed against him.' *Id.; accord Davis v. National Mortgagee Co.,* 349 F.2d 175, 178 (2d Cir.1965); 9 C. Wright & A. Mil-

ler, *Federal Practice & Procedure* § 2527, at 563 (1971) ('If all of the witnesses deny that an event essential to plaintiff's case occurred, he cannot get to the jury simply because the jury might disbelieve these denials. There must be some affirmative evidence that he event occurred.' (footnote omitted.))."

I see no reason why that well-established principle should not be applied to the case at bar. Accordingly I decline to find waiver on the basis of Obafemi's asserted pre-verdict advice to the defense team that he recognized Carter as someone he once knew.

■ The alternative theory of defense waiver by failure to exercise due diligence during jury selection remains. On that aspect of the issue, I conclude that waiver exists.

The concern defendants now profess is that a juror living in New Rochelle at the time Obafemi lived there, under the name Jesse Dixon, might be prejudiced against Obafemi, and consequently against the defense, by reason of knowledge of Obafemi's criminal record. That is the whole thrust of the defense submission arising out of the prior Obafemi–Carter acquaintance.

In the words of *United States v. McKinney, supra,* defense counsel "clearly ha[d] a duty to see that" this potential source of prejudice was adequately explored during the original voir dire examinations. The potential for concern matured as soon as the voir dire indicated that a prospective juror had been born (and possibly still lived) in New Rochelle.[3] That potential concern, on defendants' own theory, was heightened because Ms. Carter is black; and the defense team had very much in mind the limited boundaries of the black community in New Rochelle. Furthermore, the defense regarded Obafemi as at least a potential witness from the very beginning.[4]

---

3. That possibility arose from Carter's questionnaire answer that she lives in "Westchester."

4. *I accept that the defense did not make the final decision to call Obafemi until Margo*

Mitchell had given particular testimony for the government. But it was highly likely from the beginning that the government would call Mitchell; and, as soon as her testimony took a predictable direction, the decision to call Obafe-

Had the defense included in the jury questionnaire Obafemi's present and former names, as it did with Fulani Sunni–Ali, there is no reason to doubt that Ms. Carter would have indicated that the name of Jesse Dixon was familiar to her, and further voir dire inquiry would have been made. Accepting *arguendo* that the defense was not required to include every potential witness on the jury questionnaire, that does not squarely address the waiver point. The undisputed facts are that before Ms. Carter was seated as a juror, the defense knew that she had been born in New Rochelle, and that an important potential defense witness had lived in New Rochelle, where members of his family still resided. Precisely because of the New Rochelle connection, the defense regarded Obafemi and his family as a potential source of information about Carter.

To be sure, neither Obafemi nor his family members recognized the name "Janet Carter." But Obafemi's involvement with the law, that underlying basis for defendants' concern, occurred while he was a young man in New Rochelle, still in school; he moved from New Rochelle in 1959 or 1960, and Carter's questionnaire showed that she had acquired a married name. Quite apart from the omission of Obafemi's names on the prospective jury questionnaire, as soon as a prospective juror with New Rochelle roots surfaced, the defendants' presently professed concerns should have triggered a prompt additional inquiry. If defendants had wished to preserve the identity of a potential witness, they could have applied for additional voir dire examination of Carter *in camera*. Following an appropriate *ex parte* showing, that application would have been granted.

In short, only the defense was in a position to appreciate pre-trial the potential prejudice of which it now complains post-verdict; and the means for guarding against any potential prejudice lay readily at counsel's hands. I conclude that defendants have waived any post-verdict objection based upon the prior acquaintance of Obafemi and Carter.[5]

*Merits of the Claim.*

Alternatively, I consider whether the present record on the Carter–Obafemi acquaintance entitles defendants to a new trial, or shows a need for further inquiry.

The defense contends that Carter's awareness of Obafemi's past constituted extraneous information, with a potentially adverse impact upon Carter or any other jurors to whom she might have recounted the adverse information. Defendants' professed concerns relate to Obafemi's credibility generally; and particularly to any knowledge Carter may have had of Obafemi's involvement in crimes of violence. Violence involving Obafemi assertedly troubles defendants because Obafemi testified to the jury concerning a meeting with Shakur and others in December 1980 at which the government contended violent acts were planned. Obafemi described a quite different agenda. Trial Tr. 12,154–12,1157. *See* oral argument of July 26, 1988 at Tr. 50.[6]

I begin the analysis with general legal principles applicable to a number of defendants' present claims and demands.

First, there is the issue of what a convicted defendant must demonstrate to obtain any post-trial jury inquiry. The Second Circuit has cautioned that "courts are, and should be hesitant to haul jurors in after they have reached a verdict in order

---

mi was made. He was thus a potential witness *ab initio.*

5. In my view, counsel's failure to explore adverse information about a defense witness is closer to that area of potential prejudice by publicity posited in *McKinney, supra,* than it is to a juror's knowledge of the defendant himself involved in *Owen v. McMann.* A defendant's consent to be tried by a juror knowing bad things about him is naturally hard to show.

6. At the June 8, 1988 *ex parte* application, defense counsel expressed concern about Carter's possible knowledge of Obafemi's drug abuse. Mr. Berman said: "If Janet Carter knew for example that he was a heroin addict that is something that goes to credibility. That is obviously a very serious problem here." Tr. 82. Judging by oral argument on July 26, defendants no longer press that area of potential prejudice. Carter said she knew nothing of Obafemi's drug use. Obafemi doubted that she would have known.

to probe for potential instances, bias, misconduct or extraneous influences." *United States v. Moon,* 718 F.2d 1210, 1234 (2d Cir.1983). Therefore a trial court "is required to hold a post-trial jury hearing only when reasonable grounds for investigation exist." *Ibid.* Such grounds exist only "when there is clear, strong, substantial and incontrovertible evidence, ... that a specific, non-speculative impropriety has occurred which could have prejudiced the trial of a defendant." *Ibid,* citing *King v. United States,* 576 F.2d 432, 438 (2d Cir.), *cert. denied,* 439 U.S. 850, 99 S.Ct. 155, 58 L.Ed.2d 154 (1978). *King* says: "To overcome this reluctance and to authorize a post-verdict inquiry there must be 'clear evidence,' 'strong evidence,' 'clear and uncontrovertible evidence,' 'substantial if not wholly conclusive evidence.'" (citing and quoting *United States v. Dioguardi,* 492 F.2d 70, 78–80 (2d Cir.1974)).

Just as these principles govern whether a post-verdict jury inquiry should be initiated, so also they control the extent of the inquiry. The Second Circuit continued in *Moon:*

"This same standard, which applies to a trial judge's determination of whether to hold a post-verdict hearing, is also useful in ascertaining whether the scope of a hearing that has been held is adequate. While the breadth of questioning should be sufficient 'to permit the entire picture to be explored,' *United States v. Moten,* 582 F.2d [654] at 667 [ (2d Cir.1978) ], that picture is painted on a canvass with finite boundaries. Therefore, in the course of a post-verdict inquiry on this subject, when and if it becomes apparent that the above-described reasonable grounds to suspect prejudicial jury impropriety do not exist, the inquiry should end."

718 F.2d at 1234.

As the cases discussed *infra* show, a trial judge made aware of extraneous matter reaching the jury may, depending upon its nature and the totality of the circumstances, conduct no inquiry at all; interrogate only the jurors immediately involved in the incident; or interrogate all of the jurors.

The second principle relates to the issue of prejudice, once extraneous matter is shown to have penetrated the jury room.

Defendants contend generally that whenever any extrajudicial contact with a jury is established, the jury is deemed presumptively prejudiced; and while that presumption is rebuttable, the government bears a heavy burden to establish that such contact was harmless to the defendant. Defendants cite *Owen v. Duckworth,* 727 F.2d 643, 646 (7th Cir.1984) for that proposition. Comparable language is found in Second Circuit cases. *See, e.g., Sher v. Stoughton,* 666 F.2d 791, 795 (2d Cir.1981).

*Owen v. Duckworth, Sher v. Stoughton,* and other federal appellate cases cite for that proposition the Supreme Court's decision in *Remmer v. United States,* 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654 (1954). Given *Remmer*'s seminal influence in this area, it is useful to examine it in some detail.

In *Remmer,* during defendant's trial on federal tax charges an unnamed person communicated with a juror who afterwards became the jury foreman and remarked to him that he could profit by bringing in a verdict favorable to defendant. The juror reported this communication to the trial judge, who informed the prosecuting attorneys, following which the FBI made an investigation and report, which the judge and prosecutors considered. No notice was given to the defendant, who learned of it for the first time after the verdict against him. Defendant moved for a new trial, and requested an evidentiary hearing. The District Court declined to hold a hearing and denied the motion. The Ninth Circuit affirmed. The Supreme Court vacated and remanded to the District Court with directions to hold a hearing "to determine whether the incident complained of was harmful to the petitioner, and if after hearing it is found to have been harmful, to grant a new trial." 347 U.S. at 230, 74 S.Ct. at 451–52. At 229, 74 S.Ct. at 451, the Court used the language which the

lower federal courts have frequently quoted:

"In a criminal case, any private communication, contact, or tampering, directly or indirectly, with a juror during a trial *about the matter pending before the jury* is, for obvious reasons, deemed presumptively prejudicial, if not made in pursuance of known rules of the court and the instructions and directions of the court made during the trial, with full knowledge of the parties. The presumption is not conclusive, but the burden rests heavily upon the Government to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant." (Emphasis added).

The Seventh Circuit has paraphrased *Remmer*'s holding to be "that unauthorized private communications with jurors on matters *pending for their deliberation* was presumptively prejudicial." *United States v. Fleming*, 594 F.2d 598, 608 (7th Cir.), *cert. denied*, 442 U.S. 931, 99 S.Ct. 2863, 61 L.Ed.2d 299 (1979) (emphasis added).

By way of contrast, communications involving trial jurors may be characterized as "innocuous" when they do not directly involve the contested issues. *Rushen v. Spain*, 464 U.S. 114, 121, 104 S.Ct. 453, 457, 78 L.Ed.2d 267 (1983). *Rushen* involved a state trial on various charges, including murder and conspiracy allegedly involving the Black Panther Party. A prospective juror (who became a juror) stated during voir dire that she had no personal knowledge of violent crimes and that she did not associate the Black Panther Party with any form of violence. However, evidence was introduced at trial concerning an unrelated murder by a Black Panther, triggering the juror's recollection that the victim of the unrelated murder had been the juror's childhood friend. The juror called these circumstances to the attention of the trial judge, who "simply assured her that there was no cause for concern," but did not advise defendants or their counsel of the incident. Reversing the lower appellate court's direction for a new trial, the Supreme Court characterized the communi-

cation as "innocuous" because judge and juror "did not discuss any fact in controversy or any law applicable to the case." *Id.* at 121, 104 S.Ct. at 457. In *Owen v. Duckworth, supra,* the Seventh Circuit cited *Rushen v. Spain* for the proposition that: "While serious, extra-judicial contacts will not always rise to the level of prejudicial error; some may be harmless." 727 F.2d at 646.

In *United States v. Bagnariol,* 665 F.2d 877, 885 (9th Cir.1981), the Ninth Circuit stated generally:

"No bright line divides cases of juror misconduct that demand reversal from those that must be affirmed. But some similarities are discernible from cases in which convictions were reversed. Juror misconduct generally relates directly to a material aspect of the case. When finding reversible prejudice, courts have described a direct and rational connection between the extrinsic material and a prejudicial jury conclusion, as distinguished from a connection that arises only by irrational reasoning."

Consistent with the fact that not all extra-judicial contacts or extraneous communications relate sufficiently to "the matter pending before the jury," the Second Circuit has repeatedly held in the context of pre-trial or trial publicity that the "trial judge should first determine whether the coverage has a potential for unfair prejudice." *United States v. Chang An–Lo,* 851 F.2d 547, 558 (2d Cir.1988). *Chang An–Lo* cites and quotes *United States v. Lord,* 565 F.2d 831, 838 (2d Cir.1977): "If the broadcast or article contains no information beyond the evidence in the case, or if the information is clearly innocuous ..., further inquiry may not be necessary." *Ibid.* *Chang An–Lo* then cites with approval *United States v. Carrodeguas,* 747 F.2d 1390, 1395 (11th Cir.1984), *cert. denied,* 474 U.S. 816, 106 S.Ct. 60, 88 L.Ed.2d 49 (1985), in which the Eleventh Circuit characterized as harmless printed information which was "unrelated to the charges for which the appellants were being tried." While these decisions deal with allegedly prejudicial publicity, the principles announced apply

with equal force to other areas of extraneous jury communications. *Bruce v. Duckworth*, 659 F.2d 776, 781 (7th Cir.1981).

■ A third general principle is that the allegedly prejudicial extraneous material must be considered within the context of the evidence at large. The Second Circuit stated that proposition in *United States v. Weiss*, 752 F.2d 777 (2d Cir.), *cert. denied*, 474 U.S. 944, 106 S.Ct. 308, 88 L.Ed.2d 285 (1985). The Second Circuit's discussion on the point is worth quoting at length:

"We have recognized that 'extra-record information that comes to the attention of a jury is "presumptively prejudicial."' *United States v. Hillard*, 701 F.2d 1052, 1064 (2d Cir.), *cert. denied*, 461 U.S. 958, 103 S.Ct. 2431, 77 L.Ed.2d 1318 (1983) (citing *Remmer v. United States*, 347 U.S. 227, 229, 74 S.Ct. 450, 451, 98 L.Ed. 654, 656 (1954)).

This presumption may be rebutted, however, by an affirmative showing on the part of the government that the information was harmless. *Id.* 'The touchstone of decision in a case such as we have here is thus not the mere fact of infiltration of some molecules of extra record matter ... but the nature of what has been infiltrated and the probability of prejudice.' *United States ex rel. Owen v. McMann*, 435 F.2d 813, 818 (2d Cir. 1970), *cert. denied*, 402 U.S. 906, 91 S.Ct. 1373, 28 L.Ed.2d 646 (1971) (citations omitted).

The trial court should assess the 'possibility of prejudice' by reviewing the entire record, analyzing the substance of the extrinsic evidence, and comparing it to that information of which the jurors were properly aware. *Sher v. Stoughton*, 666 F.2d 791, 794 (2d Cir.1981). The court may properly conclude that such extra-record information was non-prejudicial if it determines that an abundance of properly admitted evidence relevant to this matter exists. *Hillard, supra*, at 1064; *Sher, supra*, at 793–94."

752 F.2d at 782–83.

The fourth general principle is stated by Judge Friendly in *Miller v. United States*, 403 F.2d 77, 83 n. 11 (2d Cir.1968):

"Where an extraneous influence is shown, the court must apply an objective test, assessing for itself the likelihood that the influence would affect a typical juror."

As the Second Circuit said in *Calbas, supra*, 821 F.2d at 897, *citing Miller*, "the determination of prejudice is an objective one."

■ As with all the incidents upon which defendants rely, I must apply these principles to the circumstances arising out of Ms. Carter's prior acquaintance with Obafemi.

At the threshold, I should consider just what the evidence reveals that acquaintance to have been. I have quoted Ms. Carter's account. To a significant degree, Mr. Obafemi's testimony corroborates it. In sum, Ms. Carter remembers Mr. Obafemi with less than perfect clarity; not surprisingly, since she had neither seen nor spoken to him in thirty years. Her recollection is one of a high school boy who "used to get in trouble." She could not remember "what he used to do." She recalled that "sometimes his name would be in the paper. Nothing serious, I don't think. It was just like some mischievous type of a kid."

In oral argument, Mr. Lumumba laid great stress upon the violent nature of the youthful Jesse Dixon's encounters with the law in New Rochelle, and the newspaper publicity it received. He questioned whether Carter could be believed in characterizing as "mischievous" the sort of serious incidents with which Obafemi was involved.

Two questions arise. The first is what the local press reported. The second, and obviously of greater significance, is whether what the press reported furnishes a reasonable doubt as to the accuracy of Carter's stated present recollection of what the press reported.

In addressing the first issue, I am assisted by the letter dated July 27, 1988 from Jill Elijah, Esq., co-counsel for co-defendant Buck, enclosing copies of stories from the New Rochelle Standard Star. Ms. Elijah tells me in her letter that her paralegal

devoted "several days to scan all of the newspaper articles" for the ten-year period between 1950 and 1960. That search unearthed one article appearing in the Star on July 5, 1956; two on March 2, 1957; one on March 16, 1957; and one on August 9, 1957. The articles of March 2 and March 16, 1975 describe the same incident. Those of July 5, 1956 and August 9, 1957 describe different incidents.

Each article is relatively brief. The article appearing on July 5, 1956, one of the two articles appearing on March 2, 1957, and the articles of March 16 and August 9, 1957 are single-column articles of three, four or five paragraphs' length. The other article of March 2, 1957 has a two-column headline, and comprises six paragraphs of text.

The July 5, 1956 article says that "three teenagers", one of them being Dixon, pleaded guilty to charges of disorderly conduct in City Court. The article states:

> "They are accused of throwing rocks and soda bottles at the 7–Up plant, Brooks Street. One broken bottle struck Charles Luttice, twenty-eight, of the Bronx, a bystander who was unloading his truck at the plant, nearly severing his ear."

The last of these articles, which appeared on August 9, 1957, states that the trial of Jesse Dixon, then eighteen years old, started that morning in Mamaroneck Village Court. Dixon was charged with being "one of a group of an estimated 100 youths who crashed a 'sweet sixteen party' at the home of Mrs. Harriet E. Green, 139 Madison Avenue. Another youth arrested with Dixon, the newspaper recounted, "had pleaded guilty and was fined $25."

The two articles of March 2, 1957 and the article of March 16, 1957 refer to the same incident. They recount Dixon's arraignment on a charge of assault in the third degree arising out of a "feud between two teenage gangs," one from New Rochelle and the other from Mount Vernon, which "erupted in a bus beating" when members of a New Rochelle gang called the "Monarchs," of which Dixon was a member, boarded a bus "armed with baseball bats, metal pipes and wooden billies and attacked" two fifteen-year old youths. The March 16 article recites that Dixon pleaded guilty to third degree assault and was given two concurrent 30–day terms.

Accepting Ms. Elijah's representation that this is the sum total of Obafemi's press coverage during the pertinent years in New Rochelle, it is hardly surprising that Ms. Carter did not equate the youth she knew as Jesse Dixon with Jesse James. That is not to denigrate the seriousness of the incidents in which Obafemi was involved. But I find nothing in these articles to cast doubt upon the veracity of Carter's statement to the Court, or the accuracy of her thirty-year-old recollection of this public record of Jesse Dixon's troubles with the law.[7]

Secondly, nothing that Carter recalled about Obafemi bore directly upon "the matter pending before the jury," which is to say, the guilt or innocence of the defendants of the crimes with which they were charged. The connection between this "extrinsic material" (Carter's prior knowledge of Obafemi) and the prejudicial jury conclusion is tenuous at best.

The cases upon which defendants place principal reliance are readily distinguished. The extraneous matters all bore directly on the trial process or issues. In *Owen v. Duckworth, supra,* during trial a juror received an anonymous phone call in which the caller told the juror: "God damn you, honky. You better not testify. We have a contract out on you. We are going to get you. We are going to get you." 727 F.2d at 644. The juror reported this telephone call to the trial judge, who after interviewing her continued her as an impartial juror. Notwithstanding the trial judge's instructions, the juror discussed the telephone call with other jurors. After a federal magistrate's inquiry of all trial jurors, the Seventh Circuit concluded that "the three jurors who attributed the call to Owen [the

---

7. Counsel made repeated reference to Dixon cutting someone's ear off. All the press reported was that one of several youths threw a bottle, which severely cut a bystander's ear.

defendant] or an associate may well have been prejudiced by their knowledge." *Id.* at 648. On habeas corpus from the state court, a new trial was ordered. The Seventh Circuit cited the burden imposed by *Remmer, supra,* which also involved an anonymous call to a juror during the trial (offering a bribe rather than making a threat).

In *United States v. Ferguson,* 486 F.2d 968 (6th Cir.1973), also cited by defendants, during the trial counsel for one of the defendants advised the trial judge that his client had received a telephone call from a friend who had spent a portion of the previous evening with one of the jurors. Counsel advised that the friend had told him that the defendant had nothing to worry about, because the juror [one Austin] "had this thing all figured out that he knew who the heavy was." The trial judge interrogated Austin, denied defendant's motion for a mistrial, but excused Austin from the jury. The record revealed that Austin, prior to his excusal, had made at least two statements on the case to other jurors, consistent with the defendants' innocence. The Sixth Circuit, ordering a new trial, concluded:

> "It is not unreasonable to believe that Hampton [one of the other jurors] may have had his suspicions aroused that Austin's statements to him were related to Austin's excusal from the jury and indicative of a possible attempt by defendants to influence the jury improperly."

486 F.2d at 972.

Defendants at bar place considerable reliance upon *United States v. Blair,* 444 F.Supp. 1273 (D.D.C.1978). That case arose out of a two-count indictment charging defendant Blair and one Claude Johnson with distributing heroin. Johnson pleaded guilty to count two. Blair was tried before a jury on both counts. The government's case against Blair was based on circumstantial evidence tending to prove that Blair supplied Johnson with heroin, which was subsequently sold to undercover police officers. The government's evidence placed Blair at Johnson's home at or about the time that Johnson was allegedly selling

heroin at that location to undercover officers. Blair was arrested shortly after the second transaction.

As to the first count, Blair offered an alibi defense, that he was attending choir practice at the time of the transaction. As to the second count, Blair's defense was that he went to Johnson's apartment for the purpose of obtaining a loan. Blair denied any knowledge of the drug transactions.

The trial took two days. The jury deliberated ten hours, and returned a verdict of not guilty as to count one and guilty as to count two.

After the entry of the verdict, a juror, Ms. Smith, told the prosecutor that she had overheard another juror, Ms. Thompkins, state during deliberations that Thompkins knew Claude Johnson. The trial judge thereupon took testimony from jurors Smith and Thompkins. Smith testified that she overheard this colloquy during deliberations:

> "Ms. Thompkins: 'I can't answer that question (to Juror Number Four, later identified as John V. Moten). I know Claude Johnson personally.'
> Mr. Moten: 'Are you sure it's the same one?'
> Ms. Thompkins: 'Yes.'"

*Id.* at 1275

Smith could not remember the question asked by Moten. She did recall that at the time this discussion occurred, the jury had already reached a verdict of not guilty on count one, and all the jurors but Moten had voted for conviction on count two. Ten minutes after the incident the jury returned its unanimous verdict. Thompkins testified that she did state during the deliberations that she knew Johnson, although she could not recall the particulars of the discussion. She testified that in fact "she did know Mr. Johnson, that she had gone to Junior High School and High School with him, and that she had heard that Mr. Johnson was 'hooked on drugs'". *Ibid.*

The District Court ordered a new trial. The judge based his decision solely upon the discussion between Thompkins and Moten, in which Thompkins stated: "I know

Claude Johnson personally." The District Court concluded, without an analysis of its reasons, that:

"... considering all the particular circumstances of this case, Ms. Thompkins' statement that she knew the codefendant Claude Johnson, coupled with her prior vote of guilty on count two, raised a sufficient possibility of prejudice to the defendant Clarence Blair."

*Id.*

Resisting the defendant's motion for a new trial in *Blair*, the government relied upon Judge Friendly's opinion for the Second Circuit in *United States ex rel. Owen v. McMann, supra,* where the Second Circuit, ordering a new trial, observed that jurors' statements concerning the defendant himself "went beyond Owen's being something of a ne'er do-well; they include allegations of at least two specific incidents which had not been received in evidence and which Owen had had no opportunity to refute." 435 F.2d at 818–19, quoted in *Blair* at 444 F.Supp. 1276 n. 4. The district judge in *Blair* expressed the view that if Judge Friendly meant to suggest in *Owen v. McMann* "that such specificity was necessary" to a finding of prejudice, that approach was "unsound." 444 F.Supp. at 1276.

I will come to *Owen v. McMann* shortly. As for *Blair*, the fact is that a juror personally knew the individual with whom the defendant was alleged to be trafficking drugs, those drugs being sold out of Johnson's apartment, and whose presence in that apartment Blair sought to explain away. There was, in short, a direct connection between the individual the juror knew and the criminal acts for which defendant was tried. In the case at bar, that circumstance does not arise: Obafemi was not charged in the indictments, nor did the government's proof put him at the scene of any of the criminal acts charged.

The significance of the direct connection present in *Blair* is emphasized by comparing *Blair* with the District of Columbia Circuit's subsequent opinion in *United States v. Brooks*, 677 F.2d 907 (D.C.Cir. 1982). Brooks was convicted of murder.

He sought a new trial on the basis of an affidavit from the foreman of the jury which stated that the juror was an employee at a dry cleaning establishment. During jury selection in December 1968, the juror was asked if he recognized the defendant, and honestly answered "No," because he did not recall having seen him before. However, after the trial, a co-worker told the juror that the defendant "was the same man that I had often seen coming to" the cleaning establishment to visit a co-worker. The juror then definitely recalled that the defendant was indeed the same man who had visited the cleaning establishment in the late spring or early summer of 1968. The juror said in his affidavit that he saw defendant over a period of weeks at least 7 or 8 times. The juror said: "I paid particular attention to him because of his neat, immaculate and fashionable attire. In addition, he had a noticeable processed hairstyle." 677 F.2d at 909 n. 1.

Defendants sought a new trial on the theory that this series of "casual observations ... gave rise to at least the *possibility* that [the juror] possessed a *subconscious memory* of Brooks that may have prejudiced him against Brooks." (emphasis in original). 677 F.2d at 909. Brooks sought an evidentiary hearing to explore that possibility. The District Court dismissed Brooks' petition without a hearing. The Court of Appeals affirmed. It recalled its prior holding that "the evidence against Brooks was 'overwhelming,'" and added: "There is no basis whatsoever for now requiring the district Court to conduct a hearing to explore the possibility that *subconscious memories* may have influenced the deliberations of one of the jurors." 677 F.2d at 914.

I will now consider the concept of prejudice as articulated by Second Circuit cases. To the extent that Second Circuit case law, viewing the trial evidence in its entirely, applies more demanding criteria in the demonstration of prejudice requiring a new trial than other circuits may, I am of course bound by the rule in this circuit.

In *Owen v. McMann, supra,* defendant Owen was convicted by a jury on charges of robbery, assault, and larceny. Follow-

ing the verdict, a juror, one Kassouf, gave this account to the trial judge:

"... Kassouf averred that Jeffrey and two other jurors, Mrs. Janak and Mrs. Taurisano, informed the other jurors that they 'knew all about' Craig Owen, and referred to unfavorable incidents in Owen's life which were entirely unrelated to the charge. Another juror, Mr. Tucker, made an affidavit that these same three jurors 'informed the jury that they knew various things about Craig Owen and that they had reason to believe from outside information that he was guilty.'"

The federal district court, in response to defendant's habeas petition, conducted an evidentiary hearing to which the five jurors referred to were summoned. The district court found a probability of prejudice, and issued the writ. The State appealed. The Second Circuit affirmed in an opinion by Judge Friendly. On the possibility of prejudice, he observed that "there is no 'litmus paper test' for making such a determination." 435 F.2d at 818. He found, however, a useful definition in *United States v. McKinney*, 429 F.2d 1019, 1022–1023 (5th Cir.1970), in which the Fifth Circuit said in part:

"In every criminal case we must endeavor to see that jurors do not [consider] in the confines of the jury room * * * *specific facts about the specific defendant then on trial* * * *"

*Ibid* (emphasis added).

Reverting to the facts of the case before him, Judge Friendly wrote:

"Owen's case falls on the impermissible side of this by no means bright line, *although perhaps not by much.* On the basis of the judge's findings, the jurors' statements went beyond Owen's being something of a ne'er-do-well; they included allegations of at least two specific incidents which had not been and probably could not have been received in evidence, and which Owen had had no opportunity to refute."

435 F.2d at 818–819 (emphasis added).

It is this analysis which in *Blair, supra* the District of Columbia trial judge characterized as "unsound."

In *Sher v. Stoughton, supra,* defendant was convicted of murder. During the trial an unidentified female telephoned six jurors at their homes, and succeeded in speaking with five of them. When advised of this, and that the jurors receiving the calls had discussed them with other jurors, the trial judge interrogated each juror. The nature of the calls is summarized by the Second Circuit as follows:

"Several of the jurors said that they had discussed the calls among themselves, and other jurors admitted overhearing those discussions. The jurors who received the calls said they were told that Sher was guilty, that his defense counsel should be disregarded, that the juror should urge the other jurors to vote for the 'electric chair' and that the defendant's insanity defense should be disregarded. One juror, William Nachbar, was also told that the defendant had a prior record, that he was a 'vicious killer' and that his co-defendant had been sentenced to death."

666 F.2d at 793.

The trial judge issued curative instructions, and satisfied himself that the jurors were still impartial. Following conviction and rejection of direct appeals by the state courts, Sher filed a federal habeas petition. The District Court granted the writ, but the Second Circuit reversed. One factor in the Court of Appeals' reasoning was "the information that [the jurors] properly had before them"; the Court of Appeals had previously observed: "At the time the calls were received, the jurors had already heard the government's case in detail, which placed the onus for the killing on Sher and included several eyewitnesses." 666 F.2d at 794–95.

The defendants at bar depict *Sher*'s rationale as turning upon the curative instructions the trial judge was able to give prior to verdict, an opportunity not present here. But *Sher* is also authority for the independent proposition that the potential prejudice of extraneous information must be judged in the light of the material evidence properly admitted.

That is demonstrated by *United States v. Hillard*, 701 F.2d 1052 (2d Cir.1953). Defendants in *Hillard* were charged with participating in an extensive heroin distribution network, headed by defendant Hillard, and informally known as the "Black Sunday" ring. Following conviction, Hillard appealed on the ground that jurors had access to extra-record information. During deliberations, the forelady informed Judge Lasker, the trial judge, that one juror had told the others during deliberations that one of defendants' lawyers was formerly a prosecutor, that some of the defendants were brought to court in handcuffs, and that defendants' attorneys had been involved in a similar case in the recent past. Judge Lasker interviewed the foreperson, the "garrulous juror", and one other juror who had impressed the judge "as being very steady and sensible." 701 F.2d at 1063. After interviewing those three jurors, Judge Lasker determined that a cautionary instruction would be sufficient, which he gave to all jurors. Then, several days later, as deliberations continued, "it was learned that the problem juror might have heard extra-record conversations to the effect that defendants' Black Sunday heroin operation did exist and was still in operation." *Ibid.* The district judge decided not to interrupt the jury's deliberations with a further inquiry, and denied the defendants' motion for a mistrial. Hillard appealed on the ground that an evidentiary hearing should have been held to determine the extent to which extraneous information, including the possible continued existence of the heroin ring, may have come to the jury's attention. The Second Circuit affirmed, stating at 1064:

"Of somewhat greater concern is the infiltration of extra-record information concerning the existence of the Black Sunday heroin ring. Proof of the existence of the ring was critical to the government's case. But as this court indicated in *Sher*, such information may be only 'cumulative' and non-prejudicial if it concerns a matter as to which there is abundant properly admitted evidence. *Sher v. Stoughton*, 666 F.2d at 793–94. We think that is the case here. Indeed, on summation defense counsel conceded that 'there is overwhelming evidence of a narcotics conspiracy....' Under these circumstances, we cannot say that the District Court abused its discretion in refusing to hold an evidentiary hearing and denying defendants' motion for a mistrial."

In *United States v. Weiss, supra*, a prosecution for mail fraud, perjury, racketeering, and tax fraud, the defendant alleged jury contamination because one juror read to the others a textbook explaining the responsibilities and training of certified public accountants as distinguished from bookkeepers. Defendant asserted that his status as a CPA was essential to the jury's determination of what he knew about the ventures, and that the "infiltration" of text book definitions of a CPA's duties into jury deliberations deprived him of a fair trial. 752 F.2d at 782. The Second Circuit, citing *Sher*, said that the trial court "should assess 'the possibility of prejudice' by reviewing the entire record, analyzing the substance of the extrinsic evidence, and comparing it to that information of which the jurors were properly aware." Extra-record information is non-prejudicial if the trial court "determines that an abundance of properly admitted evidence relevant to this matter exists." *Id.* at 783, citing *Hillard, supra* and *Sher supra.*

In *United States v. Calbas, supra*, during deliberations a juror consulted a telephone directory not in evidence and discovered that there were a number of Calbases listed in Brooklyn, including that section where Calbas was identified by a government witness as a participant witness in a heroin transaction. The Second Circuit, having reviewed the government's theory and the evidence in the case, concluded that "Calbas's residence in 1980 could hardly have been material, given the evidence before the jury." 821 F.2d at 895. Thus, the Second Circuit concluded on the point: "The record supports the district court's determination that Calbas suffered no prejudice from [the juror's] disclosures." *Id.* at 896, citing *Weiss, supra* and *Hillard, supra.* The Court of Appeals makes it

clear, in footnote 9 dropped from the text at that point, that the non-prejudicial nature of the juror's disclosure was "dispositive," independent of the inquiry which the judge thereafter conducted. In *Hillard*, cited for this point in *Calbas*, there was no inquiry at all of the jurors on the point at issue. *Calbas* distinguishes *Bulger v. McClay*, 575 F.2d 407 (2d Cir.), *cert. denied*, 439 U.S. 915, 99 S.Ct. 290, 58 L.Ed.2d 263 (1978), where it appeared post-verdict that during deliberations a juror changed his vote after another juror mentioned the contents of a newspaper article published over the weekend giving defendant's address which, given the nature of the proof and the defendant's case, "rendered Bulger's excuse for being in the area highly improbable." *Bulger* at 409. Thus, in *Calbas*'s phrase, the extraneous address introduced into jury deliberations in *Bulger* "bore directly on the credibility of defendant's alibi." 821 F.2d at 896. That extraneous material was by its nature prejudicial, because, in the Supreme Court's phrase in *Remmer*, where this analysis began, "it bore directly upon the matter pending before the jury."

In the case at bar, to the extent defendants urge that Carter's prior acquaintance with Obafemi cast doubt, even subconsciously, upon his credibility as a witness, there was an abundance of record evidence from which his credibility could be challenged. The jury knew that Obafemi had been convicted of illegal possession of a firearm, and of obstructing governmental administration by his conduct in a courtroom. The defense on redirect elicited Obafemi's versions of these incidents, but it was for the jury to make of them what it would. The jury also knew of Obafemi's close relationship with Shakur, and Obafemi's political beliefs, including his view that the crimes at Nanuet and Nyack formed part of a justified "war." Tr. 12,351.

To the extent that Carter's knowledge of Obafemi's "violent" youth is said by defendants to possibly undermine a defense based upon the non-violence of Shakur's own acts, two eyewitnesses, Tyrone Rison and Raymond Oliver, testified concerning Shakur's planning of and participation in crimes of violence. Defendants challenged the credibility of Rison and Oliver, particularly Rison, at trial; but again, this was for the jury.

Given the limited rationale of *Remmer* and its progeny, and the three-step inquiry Second Circuit case law applies to extra-record material reaching juries, it is clear that once Obafemi testified to the nature and vintage of his acquaintance with Jane Carter, no further inquiry was mandated. But it seemed preferable to interrogate Carter; and, having determined to interrogate juror Mitchell on an unrelated point, to ask him if any juror had mentioned being acquainted with any witness. To that question Mitchell responded in the negative, Tr. 14–15, which is in accord with Carter's testimony that she mentioned to only one or two jurors that she had known Obafemi.

I conclude on this aspect of the case that Carter's prior knowledge of Obafemi stemming from childhood acquaintance was by its nature non-prejudicial to either defendant; that she did not share those recollections with other jurors, but it would make no difference if she had; and that, viewing the material trial evidence in its entirety, and applying an objective test, it cannot reasonably be said that this prior acquaintance would have affected a typical juror. Thus no basis for a new trial emerges from the Carter–Obafemi acquaintance, and there is no need for further inquiry.

**B. Juror Floyd Mitchell's Encounter with Former Prospective Juror George Douglas.**

**1. Factual Background**

During jury selection a prospective juror named George Douglas was interviewed. Douglas stated that he was employed as the manager of a canteen and other visitor's services at the Veteran's Administration Hospital in the Bronx. After that information had been elicited, and while Douglas was still a prospective juror, the defense team sent an investigator, Amilicar Shabazz, to the hospital to ask questions of co-workers about Douglas and his back-

ground. A co-worker told Douglas about that contact, who then related it to the Court in the presence of defendants and counsel. Douglas inquired "whether or not it is a practice that someone would actually go to the job to inquire a person's character and such." Tr. 1296. Douglas added that, according to his co-worker, the inquiring individual (who had not identified which party he represented) stated that "they would love to have me on the case," Tr. 1297, a comment which Douglas found "rather unusual." *Ibid.* The Court advised Douglas that this was not a usual or typical incident; that it had nothing to do with his qualifications to serve on the jury; and put further questions, at the conclusion of which Douglas said he thought he could still be a fair-minded juror in the case. Tr. 1309–10. No party sought to challenge Douglas for cause. The defense exercised a preemptory challenge against him, and he withdrew from the case.

Floyd Mitchell was selected as a trial juror. Mr. Mitchell is a veteran. He pursues regular courses of treatment at the VA Hospital in the Bronx. One day during the trial, while Mitchell was at the hospital for that purpose, he encountered Douglas by chance. Mitchell and Douglas had a conversation, to which I will come. Preliminarily, it is sufficient to say that during Ms. Carter's telephone conversation with the deputy court clerk the day after the verdict, Ms. Carter mentioned to the clerk that during the trial Mitchell had told the other jurors that he had encountered Douglas in the VA Hospital, and that Douglas had told Mitchell of the defendants' contacts concerning him during the jury selection process, and of Douglas' displeasure at it.

The Court advised counsel of that encounter, because it constituted extraneous information brought to the jury's attention and arguably had some connection with the trial, however peripheral or remote. The government contended that no further inquiry was necessary. In the light of the authorities discussed under Point A(2) *supra*, I could certainly have reached that conclusion; but it seemed the better course to interrogate Mitchell on the point; and,

having also decided to interrogate Carter on an unrelated point, question her about it as well.

Mitchell described his encounter with Douglas as follows:

"Q. When you saw Mr. Douglas, was the trial still going on?

A. Yes.

Q. How did it come about that you were at the hospital and saw Mr. Douglas?

A. I happened to be an out-patient at Veterans Hospital. When I first saw George, I kept saying, I know that man from somewhere, and I couldn't put it together. Until one day we were off, for some reason we were off, and I went up to the vets hospital to a clinic, and I saw George in the clinic.

In meeting, I asked him, I said, what happened? He informed me that Mr. Lumumba had came upon his job while he was off and was asking questions about him. So I was under the impression that he was disqualified or that he quit.

He asked me, how is the case coming along? I said, well, it's hard to tell. I said, furthermore, we were told not to discuss the case."

Tr. 2–3.

Mitchell then referred to another conversation he had with Douglas following the verdict which is not germane to this issue. The interview then continued:

"Q. I want to go back to the meeting that you had or, to state it more accurately, the time you saw Mr. Douglas at the hospital when the trial was still going on. For what reason had you gone to the hospital that particular day?

A. For my feet. I go to podiatry. I go for pressure. You name it, I go up there.

Q. Did you meet Mr. Douglas on that day because you had arranged to meet him in advance or did you just happen to see him?

A. No. I was shocked because, like I said, I knew I had seen him somewhere, but I never put him in the vets hospital.

Q. When did he first look familiar to you? Was that during jury selection?

A. Yes, when we were downstairs. I couldn't pinpoint. I said, I know this guy from somewhere.

Q. So you put it together when you saw him up there in the VA hospital; is that right?

A. That's right.

Q. I want to go back to the beginning of that conversation you had with him. Tell me as best you can today just what it was that you said to him and he said to you. Where was Mr. Douglas when you saw him there at the hospital?

A. In the canteen. He manages that.

Q. Did you greet him first or did he greet you first? How did the conversation start?

A. I saw him first. I said hi. He said hi. I said, I knew I had seen you somewhere, I said, but I forgot that it was here. So he says, well, what happened?

That is what he told about Mr. Lumumba coming up there. I don't know where he said he was disqualified or he asked to get off the case, because it really wasn't what I was thinking about. Just the fact that I had seen him.

So he asked, how is the case coming along? I said, well, right now it's hard to tell.

Q. Did Mr. Douglas say anything to you about how he felt personally about someone coming up and asking at his job?

A. He was upset.

Q. Do you remember just how he expressed himself when he said he was upset?

A. No. He said he didn't think they could do that. I said, I didn't know they could either. And I was shocked. You know, they tell us not to discuss the case on our side. But the lawyer comes to your job, investigates you? I couldn't figure it."

Tr. 3–5.

&ast; &ast; &ast; &ast; &ast; &ast;

"Q. On this occasion when you talked to Mr. Douglas at the hospital while the trial was still going on, how long did that conversation last?

A. About, I would say, five minutes. I went in there to get something."

Tr. 6.

The Court inquired whether Mitchell had reported this encounter to the other jurors. This colloquy occurred:

"Q. Mr. Mitchell, did you tell any of the other jurors about your meeting with Mr. Douglas? I mean the meeting you have just described to me while the trial was still going on.

A. Yes, I did, in the jury room.

Q. How long after your meeting with Mr. Douglas up in the hospital did you mention it to the other jurors?

A. I probably did the next week.

Q. The next week?

A. Yes.

Q. Tell me, first of all, as you best can remember, what it was you said to the other jurors.

A. Like I seen George, everybody wanted to know who George was. I described him. Some of them said, yeah, we seen him. I said, I couldn't place where I knew him from. I said, then I went up to vets hospital and I ran into him, and I asked him what happened. He told me he was either disqualified or he asked off the case. I asked him why. That is when he told me Mr. Lumumba had been up on his job, and he didn't like it worth a dime, he didn't like it.

Q. Did you tell the other jurors that Mr. Douglas had said to you that he was not pleased that this inquiry had been made?

A. No. He honestly didn't say that. Because I didn't know he wasn't pleased until this last meeting. That's when he told me—

Q. That last meeting took place when?

A. Last week, around about Thursday or Friday.

Q. Going back to the time when you met Mr. Douglas at the hospital while the trial was going on, did Mr. Douglas say anything about whether he was pleased or displeased or what feelings he had about the people coming up to the office, to his place of business?

A. No. Like I said, I just found this out last week that he was upset. When

he first told me this, like I said, I said, I can't believe it. He came up to your job? He said, yes. That is the furthest we went on that, because I couldn't tell him no more.

Q. When did Mr. Douglas first express to you the fact that he was irritated or displeased by the defense coming up to his place of business? When did he first say to you that he didn't like that?

A. The first and last time he said it was last week.

Q. You said to me that you did tell the other jurors that you had met Mr. Douglas during the trial.

A. Yes. Because it was like a shock, knowing that I knew him from there. I also told that he was disqualified, as far as I knew. That was the only reason I knew to get off a jury.

Q. Tell me again, as best you can remember, and I understand it was some time ago, just what it was that you told the other jurors about your first meeting with Mr. Douglas. What did you say to them?

A. When I first placed who he was?

Q. Yes, that's right. The trial is still going on and you have met Mr. Douglas in the hospital, you have placed who he is. Then you told me, I think, that you told the other jurors about meeting him. Is that true?

A. Yes.

Q. Tell me, as best you can remember, just what it was you said to the other jurors when you told them about that meeting.

A. Just that I seen him and I knew where I knew him from. I really didn't know him, but just seen him there. I says, he was disqualified, as far as I know. And I told them that Mr. Lumumba had been there, so I figured that was why he was disqualified. You know, the lawyer seen something or heard something from him he didn't like, figured it wouldn't help his case.

Q. Did any of the jurors say anything?

A. About that?

Q. Yes. Did they say anything after you had said you had met Mr. Douglas?

Did anyone say anything or ask you anything?

A. No. We bantered around, can they do that?

Q. What was said about that subject?

A. Some said he can, some said he can't. And I'm still in the dark; I don't know.

Q. Were all the other jurors there?

A. Yes. At the time we had the alternates.

Q. At the time you talked about that?

A. Yes. Mr. Obey, he wasn't there. I think his brother had—I can't remember exactly when Harold brought—his brother died and he had to go to Texas. I don't know whether he was still with us at the time or not.

Q. After that one conversation that you had with the other jurors, did you talk about Mr. Douglas again as the trial went on?

A. No. He saw me, and he just asked, how is the trial coming along? I said it was hard to tell, because I couldn't tell.

Q. Did any of the other jurors discuss this particular incident involving Mr. Douglas and the visit to his place of business after the first conversation you had with the other jurors?

A. No, because that was ancient history by then. We had other things to think about. As far as we were concerned, George was gone.

Tr. 7–11.

At the conclusion of Ms. Carter's interview, she was asked about the Mitchell–Douglas encounter. This transpired:

"Q. Somewhat different subject.

Do you remember at any time during the trial another juror, Mr. Mitchell, Floyd Mitchell, mentioning that he had met a prospective juror for the trial named George Douglas, that Mr. Mitchell had met Mr. Douglas at the Veterans' Administration Hospital in the Bronx? Do you remember him saying anything about that?

A. Yes.

Q. All right. Give me your best recollection of what Mr. Mitchell said about that subject.

A. He said that he had gone to the VA Hospital, I guess for medical care, and saw—I don't remember the gentlemen's name, but someone was a prospective juror, I think in the cafeteria. I think that's where he said he saw him. And that this gentlemen proceeded to tell him how someone from the defense team came to his job, asking a lot of questions about him, and how he resented it, and he was off that day, and he was glad that he wasn't there that day.

And Mitchell was just—I think a little surprised that they had gone to this gentlemen's job to ask questions. But that was all he said about it.

Q. Did you hear him say that?

A. Yes.

Q. Where did that occur? Where were you when Mr. Mitchell said that?

A. He mentioned it in the jury room.

Q. In the jury room? Were other jurors there, too?

A. Yes.

Q. Was there any discussion, after Mr. Mitchell said that, having anything to do with what he had said to him?

A. Someone I think said, 'Well, gee, I think that's normal procedure, if they have any questions about a prospective juror, to inquire.' And I said: 'I agree, I think that's normal procedure. I don't know.' And that was the end of it.

Q. That was the end of it?

A. Yes.

Q. Was that particular incident ever referred to again by the jurors that you were aware of?

A. No.

Q. All right. And did that conversation occur, take place some time during the course of the trial?

A. Yes."

Tr. 10–11.

### 2. Discussion

The applicable legal principles have been discussed under A(2), *supra*, and need not be repeated.

**8.** It is pertinent to observe in this contention that the jurors returned their verdict on the seventh day of deliberations, after listening to

Mitchell's encounter with a former prospective juror, and his account of that encounter to the other jurors, have nothing to do with the matters pending before the jury, or the issues presented for their resolution. Defendants' argument therefore must be, and is, that some jurors may have felt defense counsel acted improperly in contacting a prospective juror, which could cause jurors to view defense counsel with disfavor, which would in turn operate to defendants' prejudice.

Although the testimony of these two jurors is not clear on either point, I accept the facts most favorable to defendants, and assume for analysis that Mitchell told all jurors (1) that Mr. Lumumba was the member "from the defense team" who went to Douglas's place of employment; and that (2) Douglas resented the inquiry.

Defendants' contention, in essence, is that the jurors may have been so prejudiced against defendants by disapproval of defense counsel's inquiries concerning a prospective, non-seated juror that they convicted the defendants after a lengthy trial, not on the basis of the evidence against them, but because transferred resentment on behalf of a prospective juror against defense counsel.

Viewed objectively in the light of *United States v. Miller, supra,* and in the context of the entire trial record (which I must consider, given the thrust of the defendants' present contention),[8] I conclude that this extraneous information is non-prejudicial as a matter of law and that no further inquiry is required.

### C. The Andrea Incident.

#### 1. Factual Background.

During the trial, defense counsel asked to speak with the Court *ex parte*. They stated that it had come to their attention that several weeks ago, while the trial was also in progress, a juror, Andrea Herbert,

considerable amounts of testimony and examining numerous exhibits.

had dinner with two other people and made what defense counsel interpreted as "derogatory remarks" about Mr. Lumumba and about the "approach the defense had taken." Tr. 5830 (sealed record). Defense counsel went on to say that the three persons present at the dinner were Ms. Herbert, a person named Haleem, also known as Kevin Woodson, and a third person, Robert Brown. Brown is Herbert's cousin. Haleem and Brown were roommates at the time. Haleem's father is Shaheem Jabbar, who had been imprisoned in the first trial of the indictment against defendant Shakur on a contempt charge. Haleem telephoned Mr. Lumumba to advise counsel of the dinner involving Ms. Herbert, and the conversation taking place at it. Mr. Lumumba described Haleem's account as follows:

"Haleem indicated to me that she had indicated to the both of them, the cousin and him, that she was on the Brinks case, and that after that was done—now, he wasn't sure about the sequence of the conversation, so I'm not attesting to the sequence, but I am telling you after she indicated, that she at some point also indicated that she had some questions about the approach that the attorneys, is the way she put it, had taken in the case and referring specifically to Dr. Mutulu Shakur's attorneys, and it apparently had something to do with Martin Luther King and perhaps even Malcom X, some kind of comparison between Martin Luther King and Malcom.

The next thing that occurred as far as I can see, and I'm not sure it's the next thing, but anyway, another thing that occurred is—perhaps the best way I should put it is Haleem indicated, "Well, my father was involved with that case, he spent some time for contempt." And at that point—well, then the conversation terminated and those were the only two substantive things that I know of that she said. That was basically it, what was substantively said as far as I know and as far as he described it to me."

Tr. 5835–36 (sealed record).

Defense counsel expressed concern about Ms. Herbert's ability to act as a fair minded juror.

The Court, in the presence of the prosecutors and defense counsel, interrogated Ms. Herbert about this dinner and the conversation that took place. The Court also brought Robert Brown in for an interview. The Court also attempted to bring Haleem (or Kevin Woodson) in for an interview, so that all three participants in the conversation (originally reported by Haleem to Mr. Lumumba) might be heard. But Haleem failed to appear on several occasions, and eventually stopped returning calls from Chambers, although messages were left for him at his home and with Mr. Brown, with whom Haleem was rooming. It became apparent that Haleem preferred not to be interviewed on the incident; and I saw no reason to compel his attendance. The particulars of the Herbert and Brown interviews appear in the record. I need not recite them here. It is sufficient to say that, based upon the accounts given by Herbert and Brown, their demeanor while giving those accounts, and Ms. Herbert's responses to my questions, I concluded that there was no reason to excuse her as a juror. Defendants, in the absence of any account from Haleem, pointed to perceived discrepancies in Herbert's account, and argued that she should be excused, but I rejected that argument, for reasons which appear in the record and which I need not reiterate here.

■ The subject of Andrea Herbert resurfaces here because, during his post-verdict interview, juror Mitchell, misunderstanding the Court's inquiry as to whether any juror knew any *witness*, said the following:

"Q. Do you have any recollection, either during the trial or during deliberations, of any juror, any jury at all, indicating that a juror might have known at some time one of the witnesses who appeared and testified at the trial? Do you remember such an incident, anyone saying something like that?

A. Yes.

Q. All right. Tell me about it.

A. I think Andrea, something she said. Yes. Her cousin's best friend's father, I

think, knew Mutulu Shakur's father or something. Something about—yes, I think it was Mutulu Shakur's father.

Q. Who mentioned that; do you remember?

A. I think she did.

Q. That she being Andrea Herbert?

A. Yes. We couldn't figure out how she could be on the case like that. But she said, that has nothing to do with me because I didn't know him. I honestly think that is the reason."

Tr. 14.

The Court followed upon on this subject during the interview with Janet Carter:

"Q. All right. Now, do you recall at any time during the course of the trial Andrea Herbert mentioning any acquaintance that she might have had with anyone connected in any way with the trial?

A. No.

Q. Does this ring a bell with you at all?

A. No."

Tr. 12.

Defendants now say that there must be a full scale inquiry, involving all twelve jurors with respect to the Andrea Herbert incident. I accept that Ms. Herbert seems to have departed from the Court's instructions that she not discuss her interview with any other juror. But there is no showing of potential prejudice in this episode, and no further inquiry is required.

### D. Other Contentions.

Defendants address additional due process challenges to the post-verdict proceedings, and ask for interviews of the prosecutors and the Court's staff.

Defendants suggest impropriety in the Court "facilitating" a post-verdict meeting between the jurors and the prosecutors, of which defense counsel had no notice. Defendants suggest that this meeting might have "chilled" jurors from talking to the defense team after the verdict.

There is no substance to any of this. After the jury's verdict was received, the Court went into the jury room to thank the jurors for their arduous public service. The Marshal had arranged cars to take the jurors home. Some jurors expressed an interest in talking to "the lawyers" before they left. Upon inquiry, the jurors indicated they meant the prosecutors, but not defense counsel. I asked the court clerk to send for the prosecutors, who had returned to their offices, and left the jury room when the prosecutors arrived. Ms. Martin has described on the record what transpired thereafter I accept her account. There is no impropriety or prejudice in any of this. As for post-verdict interviews, Ms. Carter telephoned Chambers when she was contacted by a defense investigator. That was an appropriate thing for her to do. I then took the actions described in the Court's prior memoranda. The Court's supervision of post-verdict contacts was in accordance with Second Circuit authority.

Defendants have been made aware of every circumstance remotely pertinent to a post-verdict inquiry. The inquiries that have taken place are entirely sufficient under controlling case law. Defendants show no basis for interviews of prosecutors or Court staff.

Lastly, defendant Shakur moves by letter dated July 9, for a new trial based upon perceived errors in the Court's evidentiary rulings, and prosecutorial misconduct. Defense motions for post-trial relief were supposed to be filed and served by June 8, 1988 but I enlarge the time for filing *nunc pro tunc* for the reasons stated in Mr. Lumumba's separate letter of July 9.

The motion addresses rulings made during the course of trial. The reasons for them appear on the record. Shakur's record on appeal is preserved by this post-trial motion, but this Court denies it.

### Conclusion

For the foregoing reasons, defendants' post-trial motions are denied. Sentencing will take place on August 2, 1988 as previously scheduled.

It is SO ORDERED.